RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DAVID AYERS,

　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

No. 08-3310

STUART HUDSON, Warden,

　　　　　　　　*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00133—Kathleen McDonald O'Malley, District Judge.

Argued: June 9, 2010

Decided and Filed: October 5, 2010

Before: GRIFFIN and WHITE, Circuit Judges; MURPHY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** John T. Martin, CUYAHOGA COUNTY PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Elizabeth A. Matune, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** John T. Martin, CUYAHOGA COUNTY PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Elizabeth A. Matune, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  Petitioner David Ayers, an Ohio prisoner, appeals the district court order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  On appeal, Ayers argues that his Sixth Amendment right to counsel was violated when the state trial court allowed a jailhouse informant, Donald Hutchinson, to testify regarding incriminating statements made by Ayers in response to Hutchinson's questioning.  The sole issue on appeal is whether the judgment of the Ohio Court of Appeals on this question was an unreasonable application of clearly established constitutional law as determined by the Supreme Court.  Because the State "intentionally creat[ed] a situation likely to induce [Ayers] to make incriminating statements without the assistance of counsel," *United States v. Henry*, 447 U.S. 264, 274 (1980), we hold that Ayers' Sixth Amendment right to counsel was violated, and that the Ohio Court of Appeals unreasonably ruled to the contrary.  Accordingly, we reverse the decision of the district court and remand the case to the district court with instructions to grant a conditional writ of habeas corpus, giving the State of Ohio 180 days within which to provide Ayers a new trial or, failing that, to release him.

I.

The Ohio Court of Appeals' lead opinion by Judge Corrigan sets forth the following relevant and accurate background facts:

> The victim in this case, Dorothy Brown, was seventy-six years old at the time that she was murdered.  The victim was a resident of the LaRonde apartment complex on Shaker Boulevard in Cleveland.  The LaRonde apartment complex is a facility which was owned and managed by the Cuyahoga Metropolitan Housing Authority (CMHA) and which primarily serves elderly and disabled residents.  The victim's body was discovered at approximately 2:45 p.m. on the afternoon of December 17, 1999 and showed signs of numerous serious injuries including a fractured skull, trauma to the brain, fractures of the face, a broken finger on each hand as well as multiple bruises and scrapes.  The coroner's assistant

who testified at trial stated that there were a total of 24-27 different wounds enumerated in the autopsy report. Several of these wounds were characterized as defensive wounds, most likely received by the victim while trying to fend off an attacker.

* * *

The appellant, [David Ayers,] although not elderly or disabled, was also a resident of the LaRonde apartments. The appellant was employed by CMHA as a special police officer (SPO), the function of which is to provide security at CMHA complexes. As part of his compensation for serving as an SPO, the appellant was permitted to live at the LaRonde apartments for a reduced rent of approximately $50 per month. This program was adopted by CMHA to provide additional security and law enforcement visibility at CMHA buildings.

It is not disputed that the appellant knew the victim fairly well as the result of providing security in the building and that he had been in her apartment on several occasions prior to December 17, 1999. It is also not disputed that in the early morning hours of December 17, 1999, at approximately 2:00 a.m., the appellant, accompanied by another resident of the complex, went to the victim's apartment for the purpose of assisting her from off of the floor where she had fallen and had been unable to get up. This other resident was Sarah Harris, who the next afternoon discovered the victim's body when she went to check on the victim. At the time that Harris discovered the victim's body, the door to the victim's apartment was closed but not locked.

The Cleveland police were notified of the apparent homicide at 2:44 p.m. on December 17, 1999 and responded to the scene at approximately 3:13 p.m. At the time that law enforcement initially responded, the appellant was observed outside of the victim's unit on the fifth floor of the complex (the appellant lived on the first floor) with a group of other residents, as well as in the building lobby, in a highly agitated state. One of the officers who testified at trial stated that the appellant was "bawling" sporadically in the lobby of the building during the time period in which police initially responded to the scene and that his hands were extremely shaky while answering questions.

*State v. Ayers*, No. 79134, 2002 WL 31031675, at *1-2 (Ohio Ct. App. 2002) (Corrigan, P.J., lead opinion) (paragraph numbers omitted).

Ayers was arrested on March 14, 2000, and indicted for Brown's murder on March 27, 2000. *Id.* at *12 (Kilbane, J., concurring in part and dissenting in part). After discovery delays, caused in significant part by the State's untimely disclosure of

evidence, a jury was sworn on November 22, 2000. *Id.* at *13-16, *22 n.27 (Kilbane, J., concurring in part and dissenting in part). The following Monday, November 27, the State disclosed for the first time that it intended to call Donald Hutchinson, an inmate at the Cuyahoga County Jail that had been assigned to the same pod as Ayers in late October of that year. *Id.* at *22 (Kilbane, J., concurring in part and dissenting in part). Hutchinson was incarcerated "on charges of passing bad checks and for a probation violation arising out of additional incidents of financial misconduct, theft and dishonesty." *Id.* at *3 (Corrigan, P.J., lead opinion).

Hutchinson introduced himself to Ayers on his first day in jail during bible class. According to Hutchinson, Ayers spoke about his case from the very beginning of their association, and continued to speak with him about it frequently thereafter. Although Ayers first denied murdering Brown during several of their conversations, Hutchinson testified that Ayers' story changed during the week of, or just prior to, November 19, 2000. At that point, according to Hutchinson, Ayers "broke down" and confessed to murdering Brown. Hutchinson subsequently attempted to communicate with his attorney, and eventually contacted the Cleveland Police Department early on November 25, 2000.

At approximately 4:00 p.m. on Saturday, November 25, 2000, Hutchinson met with the two detectives assigned to investigate Brown's murder, Denise Kovach and Michael Cipo. In that meeting, Hutchinson conveyed the information he had obtained from Ayers, including Ayers' purported confession. Hutchinson further indicated that he would be willing to testify at Ayers' trial. Kovach and Cipo informed Hutchinson that the prosecutor would likely contact him and sent him back to his jail pod that he shared with Ayers and other inmates.

The detectives' report of the meeting specifically references Hutchinson's failure to include important details regarding the murder weapon and the amount of money taken from Brown's apartment. However, "within an hour or so" of speaking with the detectives and returning to the jail pod, Hutchinson directly questioned Ayers regarding both the murder weapon and the sum of money stolen. During this questioning that

occurred after Hutchinson met with the police, Ayers allegedly confessed to using a small, black iron to kill the victim and stealing $700 from her. The next day, Hutchinson telephoned his wife and asked her to contact the police on his behalf. On Monday morning, November 27, the police placed Hutchinson in protective custody.

Ayers moved to suppress Hutchinson's testimony regarding Ayers' purported confession concerning the murder weapon and amount of money stolen. However, in a ruling from the bench, the state trial court denied that motion without an explanation.

At trial, the State also presented telephone records and a written statement from Ayers' friend, Kevin Smith, as evidence that Ayers had spoken with Smith regarding his knowledge of Brown's death prior to the discovery of her body. Smith's March 17, 2000, written statement indicated:

> On Dec. 17, 1999 about 12-10 PM I got a call from David. I wasn't able to talk at that time because I think I was on the phone with another call. I told him I would call him later but he called me back. It was about 2 PM when he called. He said a resident just died and I asked how and he said he didn't know. I asked how again and he said someone must have went in there.

*Ayers*, 2002 WL 31031675, at *20 (Kilbane, J., concurring in part and dissenting in part) (internal quotation marks omitted). However, during the trial, Smith recanted portions of his written statement and testified that Detectives Cipo and Kovach pressured him into stating that Ayers phoned him regarding Brown's death prior to the discovery of her body. Indeed, although Smith's written statement indicates that Ayers called him on December 17, 1999, phone records show that both calls on that day originated from Smith's number. *See Ayers*, 2002 WL 31031675, at *2 (Corrigan, P.J., lead opinion) ("The phone records relating to appellant's home phone showed that he *received* two phone calls from a Kenneth Smith on December 17th.") (emphasis added); *see also id.* at *28 (Kilbane, J., concurring in part and dissenting in part) ("[T]he phone records show that Smith initiated both calls.").

Based largely on Hutchinson's testimony and Smith's written statement, the jury eventually[1] returned a guilty verdict on all counts after originally reporting that it was deadlocked.[2] Thereafter, in addressing Ayers' appeal, a three-judge panel of the Ohio Court of Appeals issued a divided decision, consisting of a lead opinion, a concurrence in the judgment only, and a concurring and dissenting opinion, which affirmed Ayers' convictions but remanded for re-sentencing.[3] *Id.* at *12 (Corrigan, P.J., lead opinion). On remand, Ayers was again sentenced to life in prison. The Ohio Supreme Court denied leave to appeal with one justice dissenting. *State v. Ayers*, No. 2002-1900, 782 N.E.2d 78 (Ohio Jan. 29, 2003) (table).

In January 2004, Ayers filed his § 2254 petition, raising the following grounds for relief: (1) the prosecutor willfully withheld exculpatory evidence from the defense; (2) the prosecutor engaged in misconduct by withholding incriminating evidence, making improper remarks in his closing argument, and extracting a jailhouse confession from Ayers on the eve of trial; (3) his Sixth Amendment right to counsel was violated when the jailhouse informant, acting as a state agent, obtained the confession; and (4) the evidence was insufficient to sustain his convictions. The district court denied the petition and declined to issue a certificate of appealability ("COA"). After Ayers sought permission to appeal, we determined that Ayers was not entitled to a COA on his first, second, or fourth grounds for relief because, among other reasons, reasonable jurists could not debate the denial of Ayers' claims of prosecutorial misconduct and insufficiency of the evidence. However, we determined that with regard to Ayers' claim that his Sixth Amendment right to counsel was violated by the admission of certain

---

[1] After the jury initially indicated that they were deadlocked, the trial court gave a *Howard* instruction. *See State v. Howard*, 537 N.E.2d 188 (Ohio 1989).

[2] As the state appellate court's concurring and dissenting opinion notes, "[w]ithout Hutchinson's testimony and Smith's written statement . . . the State's case against Ayers becomes extremely weak. Even with that evidence, the jury was deadlocked for a time, and returned a verdict only after the judge instructed them on the importance of returning a verdict[.]" *Ayers*, 2002 WL 31031675, at *29 (Kilbane, J., concurring in part and dissenting in part).

[3] The concurring and dissenting opinion dissented from the state appellate court's judgment overruling Ayers' sixth assignment of error, i.e., that Ayers was denied his Sixth Amendment right to assistance of counsel when the state trial court allowed Hutchinson to testify regarding his conversation with Ayers that occurred after meeting with detectives from the Cleveland Police Department. *Ayers*, 2002 WL 31031675, at *33 (Kilbane, J., concurring in part and dissenting in part).

statements he made to a jailhouse informant, Ayers had made a substantial showing of the denial of a constitutional right and, thus, granted a COA on that claim.

II.

We review the district court's habeas decision de novo.  *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") supplies the limitations of federal habeas review of state court proceedings, providing that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008).

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result.]"  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under the "unreasonable application" clause of § 2254(d)(1), habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case[,]" or if a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Harris*, 526 F.3d at 909 (citations and internal quotation marks omitted).  "In other words, a federal court may grant relief when a state court has misapplied a governing principle to a set of facts different from those of the case in which the principle was announced."

*Wiggins v. Smith,* 539 U.S. 510, 520 (2003) (citations and internal quotation marks omitted); *see also Renico v. Lett*, 130 S. Ct. 1855, 1875 (2010) (Stevens, J., dissenting) ("General standards are no less binding than discrete rules."). "[T]he central inquiry is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Harris*, 526 F.3d at 910 (citation and internal quotation marks omitted).

With respect to § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris*, 526 F.3d at 910 (citations omitted).

"On collateral review, the amount of deference paid to a state court varies based on the nature of that court's ruling." *Miller v. Stovall*, 608 F.3d 913, 918 (6th Cir. 2010). Here, the district court erred in treating the state appellate court's lead opinion as a majority opinion entitled to AEDPA deference. Because one of the three judges on the state appellate panel concurred in the judgment only and another dissented from the court's judgment on the question at issue in this appeal, there is not a majority decision that articulates the reasoning of the state appellate court on Ayers' Sixth Amendment claim.[4] *Cf. Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (acknowledging that a concurring opinion does not constitute binding precedent); *Borman v. Raymark Industries, Inc.*, 960 F.2d 327, 333 (3d Cir. 1992) ("Because [the Pennsylvania Supreme Court's lead opinion] does not represent a majority view, it is not considered controlling precedent under Pennsylvania law. Therefore, without an authoritative announcement, we still must predict how the Pennsylvania Supreme Court would rule on this issue." (citations and internal quotation marks omitted)). Rather, there is a state court *result*,

---

[4] As noted above, the state trial court also failed to articulate its reasoning for denying Ayers' motion to suppress Hutchinson's testimony.

reached after the state appellate panel adjudicated Ayers' claims on the merits. Accordingly, we shall "conduct an independent review of the record and applicable law to determine" if the state court's result "is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). "That independent review, however, is not a full, de novo review of the claims, but remains deferential because [we] cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Id.*

III.

The Sixth Amendment guarantees a criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "This right has been accorded, . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)). Thus, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 129 S. Ct. 2079, 2085 (2009) (citations omitted). "Interrogation by the State is such a stage." *Id.* at 2085 (citing *Massiah v. United States*, 377 U.S. 201, 204-05 (1964); *Henry*, 447 U.S. at 274). *See also Cronic*, 466 U.S. at 659 n.25 ("The [Supreme] Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a *critical stage* of the proceeding.") (emphasis added).

A defendant is "denied the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. The right to counsel applies not only to direct confrontations by known government officers, but also to "'*indirect and surreptitious interrogations*'" by covert government agents and informants. *Henry*, 447 U.S. at 273 (quoting *Massiah,* 377 U.S. at 206) (emphasis added); *see also Kuhlmann*

*v. Wilson*, 477 U.S. 436, 459 (1986) ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the direct equivalent of police interrogation."). As the Supreme Court stated in *Maine v. Moulton*, 474 U.S. 159 (1985),

> [o]nce the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. *The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance.* We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, *at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.*

*Id.* at 170-71 (footnote omitted and emphasis added). Therefore, a Sixth Amendment violation occurs whenever the State "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel," *Henry*, 447 U.S. at 274, or "knowing[ly] exploit[s]" a situation in order to obtain incriminating information from a defendant "without counsel being present[.]" *Moulton*, 474 U.S. at 176.

IV.

In this appeal, Ayers argues that "two specific statements elicited by Mr. Hutchinson **after** he met with the Cleveland Police on Saturday, November 25, 2000" should have been suppressed by the state trial court: (1) the details of the murder weapon, "an old black iron"; and (2) the amount of money allegedly taken from Brown's apartment, $700.00. Ayers contends that because these statements were obtained surreptitiously, after his right to counsel attached, his Sixth Amendment rights were violated. In his appellate brief, Ayers does not indicate whether he is alleging that the state court decision on this issue was "contrary to" or an "unreasonable application" of clearly established federal law. However, as the district court noted, "the facts of this case are sufficiently distinguishable from the relevant Supreme Court cases . . . . and Ayers presents no arguments or authority to the contrary." Accordingly, the "contrary

to" analysis provided for in 28 U.S.C. § 2254(d)(1) is inapplicable to Ayers' case. The relevant inquiry is limited to whether the state appellate court's result was an "unreasonable application" of clearly established federal law as determined by the Supreme Court.

The parties do not dispute that, at the time of the statements at issue, Ayers' Sixth Amendment right to counsel had attached. Moreover, contrary to the state appellate court's lead opinion's factual determination, Hutchinson clearly testified that he deliberately elicited information from Ayers after meeting with Detectives Cipo and Kovach.[5] In fact, the State acknowledges in its appellate brief that the state appellate court's lead opinion "is not entirely accurate[,]" and that it is "apparent from the record . . . that after Ayers confessed to the murder and Hutchinson spoke to the detectives, Hutchinson did ask Ayers about the details of the murder." Thus, the sole question presented in this appeal is whether the State "intentionally creat[ed] a situation likely to induce [Ayers] to make incriminating statements without the assistance of counsel," *Henry*, 447 U.S. at 274, when it returned Hutchinson to Ayers' jail pod and he thereafter deliberately elicited information from Ayers regarding the murder weapon and the amount of money taken from the victim. We hold that it did and that the state court's conclusion to the contrary was not only wrong, but involved an unreasonable application of clearly established federal law.

Although not dispositive to the issue, the parties devote much argument to the question of whether Hutchinson acted as a government agent after he was returned to Ayers' jail pod. In this regard, we note that although "[t]he Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes[,]" *Matteo*

---

[5] Although not the focus of our review, it should be noted that the state appellate court's lead opinion is based, at least in part, on inaccurate facts that are critical to the resolution of Ayers' Sixth Amendment claim. In addressing the present issue, Judge Corrigan wrote: "Hutchinson . . . stated that he was not the instigator of his conversations with [Ayers] and that [Ayers] freely and openly volunteered the information testified to by Hutchinson." *Ayers*, 2002 WL 31031675, at *7 (Corrigan, P.J., lead opinion). This statement is demonstrably false. As the magistrate judge noted, and as the State concedes, "Hutchinson admitted that he actively questioned Ayers to get more details after meeting with the detectives." Thus, it is clear from the record that at least one of the judges who voted to deny Ayers relief on his Sixth Amendment claim based that determination on an "objectively unreasonable" factual finding that is essential to that claim's resolution. *See* 28 U.S.C. § 2254(d)(2); *Miller-El*, 537 U.S. at 340. This error alone undermines confidence in the result reached by the state appellate court.

*v. Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir. 1999), several of our sister circuits have developed standards to apply when determining the agency inquiry. Some of these circuits employ a bright line rule, deciding that "[a]n informant becomes a government agent . . . only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir. 1997); *see also Moore v. United States*, 178 F.3d 994, 999 (8th Cir. 1999); *United States v. LaBare*, 191 F.3d 60, 65 (1st Cir. 1999); *United States v. Watson*, 894 F.2d 1345, 1347-48 (D.C. Cir. 1990); *Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988). Other circuits, however, flatly reject this approach, holding that "[t]here is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel. The answer depends on the 'facts and circumstances' of each case." *Depree v. Thomas*, 946 F.2d 784, 793-94 (11th Cir. 1991) (citation omitted); *see also Matteo*, 171 F.3d at 893; *Thomas v. Cox*, 708 F.2d 132, 136 (4th Cir. 1983) ("The point at which agency – hence proper attribution – for this purpose arises out of a government-citizen relationship is not subject to any bright-line test."). Embracing this broader approach, at least two of these circuits require only "'some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation [took] place.'" *Matteo*, 171 F.3d at 893 (quoting *Depree*, 946 F.2d at 794). *See also United States v. Brink*, 39 F.3d 419, 423 (3d Cir. 1994).[6]

---

[6]In evaluating this evidence, the Third Circuit examines "a number of different factors":

> First, was the informant "acting under instructions" from the government to obtain information from the defendant? [*Matteo*, 171 F.3d] at 893-94. Second, was there a "quid pro quo - in which the informant receive[d] some type of benefit, even if nonpecuniary, in exchange for assisting the authorities[?]" *Id*. at 894. Third, was there a past agency relationship between the informant and the government? *Id*. at 893; *Brink*, 39 F.3d at 423. Fourth, was the informant "ostensibly a mere fellow inmate . . ." *id*. at 893, thus, hiding from the defendant the fact that he is talking to a government agent? *United States v. Henry*, 447 U.S. 264, 272-73 (1980). Fifth, was the defendant "in custody at the time" and, therefore, subject to the "'subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents[?]'" *Matteo*, 171 F.3d at 895 (quoting *United States v. Henry*, 447 U.S. 264, 274 (1980)). Finally, was the informant a "trusted friend" and, therefore "more likely to" obtain "incriminating statements" from the defendant? *Id.* at 894-95.

*Wallace v. Price*, 265 F. Supp. 2d 545, 565-66 (W.D. Pa. 2003), *aff'd*, 243 F. App'x 710 (3d Cir. 2007).

We agree with those courts that do not limit agency in the *Massiah* context to cases where the State gave the informant instructions to obtain evidence from a defendant. As *Henry* illustrates, a *Massiah* violation can occur even where the State specifically instructs its informant "*not* to initiate any conversation with or question [a defendant] regarding the [offense for which he had been indicted]." *Henry*, 447 U.S. at 266 (emphasis added). "[I]t is not the government's intent or overt acts that are important; rather, it is the 'likely . . . result' of the government's acts." *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004) (quoting *Henry*, 447 U.S. at 271). Thus, we hold that although direct written or oral instructions by the State to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor.[7] A court must also analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency.[8] *See Henry*, 447 U.S. at 271 (indicating that a "combination of circumstances is sufficient to support" a finding of agency); *Moulton*, 474 U.S. at 176; *see also Brink*, 39 F.3d at 423-24 (suggesting that a "tacit agreement" may be sufficient to establish agency for *Massiah* purposes). To hold otherwise would allow the State to accomplish "with a wink and a nod" what it cannot do overtly. This, the Sixth Amendment does not permit.

---

[7] In this case, without reference to any case law, the state appellate court's lead opinion rejected Ayers' Sixth Amendment claim solely because it found "no evidence in the record to support [Ayers'] contention that Hutchinson was instructed by [the detectives] to ask certain questions of [Ayers] in an attempt to elicit a confession." *Ayers*, 2002 WL 31031675, at *7 (Corrigan, P.J., lead opinion). As explained above, this succinct analysis is not dispositive of the issue and demonstrates that at least one of the two state appellate judges that voted to affirm Ayers' conviction misapplied clearly established federal law.

[8] Moreover, a defendant is not required to set forth direct evidence to show a Sixth Amendment violation. As the Supreme Court stated in *Moulton*, because "[d]irect proof of the State's knowledge will seldom be available," all that is needed to establish a Sixth Amendment violation is "proof that the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel[.]" *Moulton*, 474 U.S. at 176 n.12 (citation and internal quotation marks omitted).

V.

With this framework in mind, we next turn to the critical issue of whether the State intentionally created a situation likely to violate Ayers' Sixth Amendment rights when it returned Hutchinson to Ayers' jail pod.

Evidence of Ayers' purported confession and statements to Hutchinson come from three sources in the record:  (1) the November 25, 2000, police report detailing Hutchinson's first statements to Kovach and Cipo; (2) his November 28, 2000, voir dire testimony in which Hutchinson claimed Ayers had made further admissions since his November 25, 2000, meeting with the detectives; and (3) his trial testimony.  The initial police report contains the following:

> (1) that Ayers told Hutchinson he had seen Brown's money when he went to help her;
>
> (2) that Ayers returned to Brown's apartment between 3:00 a.m. and 3:30 a.m., but Brown woke up and discovered him;
>
> (3) *that Ayers did not tell Hutchinson what weapon he used to kill Brown or how much money he had taken, and that Hutchinson had not asked*;
>
> (4) that Ayers told Hutchinson he had a friend who was going to have to testify, and that Ayers had called him, but did not admit the murder to him; and
>
> (5) that Ayers had propositioned Hutchinson for sex.

*Ayers*, 2002 WL 31031675, at *22-23 (Kilbane, J., concurring in part and dissenting in part)  (emphasis added; paragraph numbers and internal quotation marks omitted).

During his November 28, 2000, voir dire testimony, Hutchinson indicated that, following his meeting with Kovach and Cipo, he was able to elicit additional admissions from Ayers regarding both the murder weapon and the amount of money taken from the victim.  In pertinent part, Hutchinson testified:

> (1) that Ayers denied committing the murder until admitting it either "last week" (between November 20, 2000 and November 27, 2000) or "a

week before he started going to court" (between November 13, 2000 and November 20, 2000);

(2) that Ayers admitted the murder because Hutchinson was attempting to help him retain a new lawyer, and had told him that the new lawyer could not help him if he wasn't honest;

[(3)] that Ayers said he saw Brown's money and returned to her apartment to steal it, and that Hutchinson asked him how much he took, but did not get an answer;

[(4)] that Hutchinson unsuccessfully attempted to contact his lawyer over the Thanksgiving weekend to discuss Ayers' admissions, but eventually contacted detectives Cipo and Kovach directly;

[(5)] *that Ayers continued to withhold any admission concerning the amount of money taken or the murder weapon until Saturday night, after Hutchinson's first conversation with the detectives*;

[(6)] that Ayers gave Hutchinson detectives Cipo's and Kovach's names based on Hutchinson's story that his uncle was a police officer and could help him if he knew who was handling the case;

[(7)] *that Hutchinson specifically went to Ayers on Saturday night, after speaking with the detectives, and made inquiries concerning details of the murder, and that Ayers then confessed details of the murder weapon and the amount of money taken.*

*Ayers*, 2002 WL 31031675, at *23 (Kilbane, J., concurring in part and dissenting in part) (emphasis added; paragraph numbers and internal quotation marks omitted).

During voir dire, the prosecutor also elicited statements from Hutchinson (many of which had not been disclosed in the November 25, 2000, police report) through a series of leading questions, as follows:

> Q.    [Prosecutor]  Did he tell you that there was a fight with the victim, the 76 year old woman, when she woke up and caught him stealing the money; what did he tell you?
>
> A.    [Hutchinson]  He told me that she woke up and he hit her a couple of times and, you know, that's when he –
>
> Q.    You know, was he – he told you there was an altercation before that, that there was words exchanged, didn't he?
>
> A.    Yeah.  Yeah.  And then he –

Q.	Did he tell you that – he told you this, correct, the old woman was going to turn him in, right?

A.	Yeah.

Q.	And he'd lose his job, did he tell you those things?

A.	Said he'll lose his job and, you know –

\* \* \*

Q.	Now Mr. Ayers also told you that in regard to the evidence against him that the prosecution was going to call a friend of his, right?

A.	Right.  Uh-huh.

Q.	What did he tell you about the friend of his?

A.	He told me that the friend of his – he said the prosecution had called – he had called a friend of his and that they said that he told them that – told them that – weight [sic], hold – told them that he had called them – called him and said that it's a murder, you know, it was a lady found dead in our apartment, something like that.

Q.	Mr. Ayers told you that he had called a friend?

A.	Yeah.

Q.	And that he told the friend about a lady being found dead in the apartment building?

A.	Right.

Q.	But he didn't tell the friend or he didn't admit to the friend that he did the killing, correct?

A.	Right.  Right.

Q.	But he told you also that the state is going to call that friend as a witness and that the phone records would show that the call was placed one hour before the body was found?

A.	Correct.

\* \* \*

Q.	It's true, Mr. Hutchinson, David Ayers told you that a friend of his was going to come in and testify, correct?

A.	Right.

Q.     And that friend would say that during the phone conversation the day the body was found David told him that the woman was found and someone must have went into the apartment, correct?

A.     Correct.

Q.     Did – now did David Ayers proposition you for oral sex?

A.     Yes, he did.

Q.     When did that take place?

A.     That was – matter of fact that was last week.

Finally, at trial, Hutchinson testified:

(1) that Ayers stated that he admitted the murder to Smith during their telephone conversation;

(2) that Ayers first admitted the murder to him in response to Hutchinson's quotation of a Bible verse concerning the need to confess one's sins;

(3) that Ayers never mentioned seeing Brown's money when he went to her apartment to help her earlier in the evening;

(4) that he invented the story about having an uncle who was a police detective in order to obtain further details of the murder on Saturday night, and not to obtain the investigating detectives' names;

(5) that Ayers propositioned him for oral sex on Saturday night, after giving him the details of the murder weapon and amount of money taken.

*Ayers*, 2002 WL 31031675, at \*25 (Kilbane, J., concurring in part and dissenting in part) (paragraph numbers and internal quotation marks omitted).

A review and comparison of these three sources of evidence clearly demonstrates that Hutchinson's story is both inconsistent and unreliable. Importantly, it also strongly suggests, at a minimum, that the police shared information with Hutchinson. As the state appellate court's concurring and dissenting opinion explained:

Although the police report and his voir dire testimony indicate that Ayers told [Hutchinson] he returned to rob Brown because he saw money in her apartment, at trial [Hutchinson] stated that Ayers never mentioned seeing her money. The police report indicates that [Hutchinson] did not ask Ayers how much money he took [before the evening of November 25, 2000], but in voir dire [Hutchinson] stated that he did ask. [Hutchinson]

testified in voir dire that Ayers admitted the murder as part of an effort to retain a new attorney, but at trial he claimed that Ayers admitted the murder in response to a Bible quotation. While both the police report and the voir dire testimony state that Ayers denied telling Smith that he killed Brown, at trial Hutchinson stated that Ayers claimed he admitted the murder to Smith. While [Hutchinson] testified in voir dire that he created the fictitious uncle in order to learn the names of the investigating detectives, at trial he claimed that he used the story only to learn further details of the murder. Furthermore, while [Hutchinson] testified at trial that Ayers did not proposition him for oral sex until the evening of November 25, 2000, the proposition is included in the police report from an interview **that afternoon**.

\* \* \*

[Hutchinson's] story . . . draws heavily from police reports that were not available to Ayers. Just as Smith's written statement reflected Detective Cipo's mistaken view of the phone logs, Hutchinson also testified that Ayers admitted that he called Smith, despite the fact that the phone logs show the opposite. Hutchinson's reference to $700 is also curiously coincidental, as that figure has a life of its own within the police reports.[37] It is extremely odd that Ayers would admit taking this exact amount from Brown, just as it is odd that he would quote from Smith's written statement in his admission to Hutchinson, and odd that he would mistakenly claim that he called Smith on the day in question instead of Smith calling him.

---

[37]The police reports indicate that a cleaning company had visited Brown days before her murder and had offered to clean her apartment for $700. Despite testimony from a company representative that no such request was made, several witnesses, including Brown's relatives, reported that she had told them of the visit and the $700 request prior to her death.

---

Not only was Hutchinson's testimony inconsistent in a number of particulars, a review of his testimony, both in voir dire and at trial, shows that his story is highly generalized and deliberately vague as to details and dates. As noted, much of his voir dire testimony was provided to him through the prosecutor's leading questions – on his own, Hutchinson was incapable of providing coherent or consistent details. Despite knowing exactly how long he had been in jail, he continually testified that he was unable to state the times at which particular events occurred, preferring instead to present a fuzzy story that could be molded to

accommodate facts as they were revealed or inconsistencies as he was confronted with them.

*Ayers*, 2002 WL 31031675, at *26-27 (Kilbane, J., concurring in part and dissenting in part).

It is also remarkable that after meeting with Cipo and Kovach, Hutchinson knew exactly what questions to ask Ayers regarding the details of the murder. As demonstrated above, the evidence shows that Hutchinson met with the police on Saturday, November 25, 2000, to inform them of Ayers' confession to murder. The police report summarizing the content of that meeting clearly states that up to that point Hutchinson had failed to learn from Ayers what weapon he allegedly used to kill Brown or how much money he had taken. Yet, "within an hour or so" of meeting with the detectives, where he expressed his willingness to testify and was told that he would likely be meeting with the prosecutor, Hutchinson admits that he deliberately questioned Ayers about both the money taken and the murder weapon. Specifically, Hutchinson asked Ayers: (1) "do you know how much money was taken in the situation?"; and (2) "about the weapon what [] did [you] do it with?" After purportedly receiving answers to both of these questions, Hutchinson ended the conversation and exited the room.[9] The next day, Hutchinson telephoned his wife and asked her to contact the police on his behalf. Hutchinson was subsequently placed in protective custody.

Here, the "combination of circumstances is sufficient to support the . . . determination" that the State intentionally created a situation likely to violate Ayers' Sixth Amendment rights when it returned Hutchinson to Ayers' jail pod and he thereafter deliberately elicited statements from Ayers regarding the murder weapon and the amount of money allegedly taken from Brown's apartment. *Henry*, 447 U.S. at 271. Hutchinson clearly had both the motive and opportunity to gain incriminating statements from

---

[9]Specifically, Hutchinson testified that "after [Ayers] told [him] what he did it with [he] was through with it."

Ayers[10] and showed from his actions prior to meeting with Cipo and Kovach that he was capable of doing so. Moreover, Hutchinson consented to cooperate with the State, as evidenced by his indication to the detectives that he would be willing to serve as a State witness at Ayers' trial. These facts, coupled with the State's failure to place Hutchinson in protective custody until *after* he secured these additional statements, supports the conclusion that Hutchinson and the State were working in conjunction with each other.

Moreover, as discussed above, Hutchinson testified regarding statements and factual errors that could have only come from interactions with the police. Thus, at a minimum, Detectives Cipo and Kovach shared information in Ayers' case with Hutchinson. At its worst, the evidence suggests that the police specifically instructed Hutchinson on what subjects to question Ayers and/or directed Hutchinson regarding what to say in his testimony.[11]

Regardless of whether specific instructions were given by the detectives, it is evident from the record that the State violated its "affirmative obligation to respect and preserve the accused's choice to seek [counsel's] assistance." *Moulton*, 474 U.S. at 171. Given its cooperation with Hutchinson, "the State must have known that [he] was likely to obtain [additional] incriminating statements from [Ayers] in the absence of counsel[.]" *Moulton*, 474 U.S. at 176 n.12 (citation and internal quotation marks omitted).

We hold that the state appellate court's judgment concluding otherwise involved an unreasonable application of clearly established constitutional law as determined by

---

[10]Hutchinson clearly sought to profit from his testimony as demonstrated by his attempts to contact his lawyer prior to speaking with Detectives Cipo and Kovach, and by his indication at Ayers' trial that he "obviously [had] an expectation in the two cases [he had] pending[.]" Moreover, the prosecutor informed Hutchinson, prior to his testifying, that he would be rewarded for his cooperation by dismissal of all pending actions against him. Indeed, the record shows that, after testifying at Ayers' trial, "all criminal charges against Hutchinson were nolled and dismissed in Cases CR-396046 and CR-396813, and Judge Nancy Russo found he was not a probation violator and his probation was terminated with all pending fines and costs vacated in Case CR-377015." *Ayers*, 2002 WL 31031675, at *25 n.34 (Kilbane, J., concurring in part and dissenting in part). These facts alone are cause for serious concern. *See Brink*, 39 F.3d at 423-24 ("[A]t one point the government agent told [the informant] that his cooperation would be reported to the United States Attorney and Attorney General. Therefore, [the informant] may have informed on [the defendant] on the reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently, with a recommendation for a reduction in his sentence.").

[11]Detectives Cipo and Kovach deny the allegation that they instructed Hutchinson to engage in further interrogation of Ayers.

the Supreme Court in *Massiah, Henry, Kuhlmann*, and *Moulton*. Accordingly, Ayers' habeas petition must be granted. *See* 28 U.S.C. § 2254(d)(1). By failing to suppress the statements Hutchinson deliberately elicited from Ayers after he met with the police, the state trial court deprived Ayers of his Sixth Amendment right to counsel. Ayers' conviction cannot stand in light of this error, which the State has failed to argue was harmless.[12]

## VI.

For these reasons, we reverse the district court's order. We conditionally grant the writ of habeas corpus petition and remand to the district court with instructions to order that Ayers be released from custody unless the State of Ohio provides petitioner a new trial within 180 days.

---

[12]*Massiah* violations are normally subject to harmless-error analysis. *See, e.g., Milton v. Wainwright*, 407 U.S. 371 (1972) (applying harmless error analysis to a *Massiah* violation). However, by not raising the issue of harmless error in either its appellate brief, *see United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006), or "in its response to the habeas petition in federal district court[,]" *Miller*, 608 F.3d at 926, the State has forfeited consideration of this issue on appeal. *See also Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (noting that the State bears the burden of proof on harmless error); *United States v. Olano*, 507 U.S. 725, 734 (1993) (same); *Besser v. Walsh*, 601 F.3d 163, 189 (2d Cir. 2010) ("The State bears the burden of persuasion in [habeas] cases[.]").

Additionally, we note that in light of the initial deadlock by the jury, it would have been problematic for the State to assert that the constitutional error was harmless beyond a reasonable doubt.