*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MATTHEW FRANKLIN SMITH,

      Defendant-Appellant.

UNPUBLISHED
May 26, 2022

No. 354026
Crawford Circuit Court
LC No. 19-004414-FC

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder, MCL 750.316(1), under theories of both premeditation and felony-murder; torture, MCL 750.85; and unlawful imprisonment, MCL 750.349b. The trial court sentenced defendant, a second-offense habitual offender, MCL 769.10, to life in prison without the possibility of parole for the murder conviction, 45 to 80 years' imprisonment for the torture conviction, and 142 months' to 22½ years' imprisonment for the unlawful imprisonment conviction. We affirm.

## I. BACKGROUND FACTS

Defendant's convictions arose from the mistreatment and death of Dennis Everson in the small northern Michigan community of Frederic in July 2018. The prosecutor presented evidence that defendant, along with a younger man named Dylan Ziegler, came to Frederic from southeastern Michigan some days before July 2, 2018, in order to do "scrapping"—collecting scrap metal for payment—with Everson. Evidence supported that a physical altercation—involving defendant and Ziegler against Everson—developed on July 2, 2018, and that Everson died that day from severe trauma to his skull. Ziegler testified at trial against defendant. He admitted engaging in the altercation but implied that defendant had done the ultimate killing. Specifically, he testified that defendant put Everson into a small, detached camper on rural property and tried to set it on fire; drove a short ways from the camper (with both defendant and Ziegler in defendant's truck); and then took an object out of the back of the truck, disappeared for some time in the direction of the camper, came back to the truck (where Ziegler was waiting), and said that the two needed to head back to southeastern Michigan immediately. A theory set forth at trial was that Everson and

defendant had animosity toward each other because a marijuana-growing operation that the two had engaged in throughout 2017 had not run smoothly.

Defendant was placed in the same jail unit with a man named Anthony Bentley. The two shared a common area with a third man, Richard Paine. On three separate occasions, Bentley asked to speak with police; the parties refer to these conversations as "interviews." Bentley provided information about defendant to the police. In a pretrial motion to suppress, defendant argued that any information Bentley obtained from defendant after the first interview needed to be suppressed because, by that point, Bentley was acting as an implied agent of the state, and any questioning of defendant by Bentley was in violation of defendant's Sixth Amendment right to counsel. See, generally, *Massiah v United States*, 377 US 201, 206; 84 S Ct 1199; 12 L Ed 2d 246 (1964). The lower court ruled that Bentley did not become an agent of the state until immediately after the second interview, when he signed a plea agreement to provide testimony against defendant in exchange for a benefit in his own case. Accordingly, the court ruled that any information obtained before the second interview was admissible but that any information obtained after that was inadmissible. The parties do not dispute on appeal that a constitutional error occurred when Bentley testified at trial that defendant told him that the murder weapon was a hammer.[1] However, defendant did not object at trial to the testimony. After defendant filed a motion for a new trial on the basis of Bentley's testimony about the hammer, the lower court concluded that the error was not preserved for its review, was merely an evidentiary error, and was harmless under a mere "outcome-determinative" standard, but it added that even if it were to review the error under a harmless-beyond-a-reasonable-doubt standard, it would nonetheless find no basis for a new trial. This appeal followed.

## II. BENTLEY

### A. HARMLESS BEYOND A REASONABLE DOUBT

On appeal, defendant contends that the error regarding the "hammer'" testimony was preserved for review by the circuit court by virtue of the pretrial motion to suppress; that the standard for preserved, constitutional errors applied; and that the error was *not* harmless beyond a reasonable doubt. Defendant thus contends he is entitled to a new trial. The prosecutor, on the other hand, contends that the issue of the "hammer" testimony was not preserved at trial and that the court, therefore, properly applied a mere "outcome-determinative" test in evaluating the motion for a new trial.[2] The prosecutor also contends that the error was harmless even if the stricter standard for a preserved, constitutional error is applied. We agree with the prosecutor.

---

[1] It is not disputed that the information about the hammer was first disclosed by Bentley at the third interview. It is at least possible that Bentley obtained the information before the second interview but only disclosed it at the third, but nobody is arguing this angle on appeal.

[2] The prosecutor does not contest the constitutional nature of the alleged error and in fact concedes it.

MCR 6.431(B) states, in part, "On the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice." (Emphasis added.) MCL 769.26 states:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, *or the improper admission or rejection of evidence*, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [Emphasis added.]

An appellate court "reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion." *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *Id*. (quotation marks and citations omitted). An appellate court may not "tacitly endorse obvious errors under the guise of deference." *Id*. at 565 (quotation marks and citations omitted).

Whether defendant's filing of the pretrial motion to suppress was sufficient to preserve, for the circuit court, the issue of the admission of the "hammer" testimony—despite the lack of any objection at trial—is an issue of law. Issues of law are reviewed de novo on appeal. *People v Aspy*, 292 Mich App 36, 40; 808 NW2d 569 (2011).

Preserved and nonstructural[3] constitutional errors are reviewed to determine if they are harmless beyond a reasonable doubt. *People v Anderson*, 446 Mich 392, 405-406; 521 NW2d 538 (1994). The Michigan Supreme Court has stated that the pertinent question in such a review is whether it is clear beyond a reasonable doubt that a rational jury would have convicted the defendant even without the contested evidence. *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005).

If an issue is unpreserved, this Court reviews the issue for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id*. And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (citation, quotation marks, and brackets omitted).]

With regard to the motion for a new trial, it is clear that the trial court erred in stating that a nonconstitutional error was at issue; the entire question regarding Bentley's testimony involved defendant's Sixth Amendment right to counsel, and the prosecutor does not deny this. The

---

[3] No argument is being made in this case that a structural error occurred.

question is which harmless-error standard should apply. We need not resolve that issue, however, because we find that the trial court did not err by concluding that *even if* the standard for preserved, constitutional error was to be applied, a new trial would not be warranted. In fact, we find that even if the admission of Bentley's *entire* testimony[4] was erroneous, the admission was harmless beyond a reasonable doubt.[5]

First and foremost, it is of import that the jurors knew, through testimony other than that of Bentley, that a hammer had been processed for evidence (even if the processing did not yield useful information). In other words, the jurors were made aware that a hammer was being viewed as a potential murder weapon. This lessened any impact of Bentley's "hammer" testimony.

Next, Bentley's testimony was unquestionably riddled with credibility problems; the police could not verify many of the things he said. Also, Paine testified that Bentley had read some of defendant's "court materials" while in jail, with the implication being that Bentley could have obtained information from police reports. The trial court accordingly advised the jurors to evaluate an accomplice's and an informant's testimony carefully and consider whether it was corroborated. Most importantly, it is apparent from the record that Ziegler's testimony was corroborated to a much greater extent than Bentley's such that other evidence of defendant's guilt was extremely strong and a rational jury would have convicted the defendant even without the contested evidence. *Shepherd*, 472 Mich at 347.

Ziegler testified that defendant beat Everson severely when the three men were at Everson's property and that this shocked Ziegler. Ziegler testified that he punched Everson in the face once, that he and defendant forced Everson into the back of defendant's pickup truck, and that defendant drove the truck to a property owned by one of Everson's relatives. He testified that defendant dragged Everson into the small, dilapidated camper on the property and tried to set the camper on fire, and he noted that Everson was wearing only one shoe. Everson was wearing only one shoe when his body was found by the camper, and a part of a burned paper bag was found in the camper.

---

[4] Some of the "other" testimony included Bentley's claim that defendant told him that he and Ziegler committed the murder right after having taken a "selfie" photograph, which defendant showed Bentley.

[5] With respect to whether the issue of the "hammer" statement was preserved, it is true that defendant filed a pretrial motion to suppress much of Bentley's testimony. But the trial court *granted* this motion with regard to any information Bentley obtained after the second interview. What defendant needed to object to was the prosecutor's, or Bentley's, *violation of this order*. Defendant did not do so. Accordingly, a plain-error standard would apply, rendering the harmless-error conclusion stronger. In addition, defendant, with respect to the trial court's decision regarding the motion for a new trial, argues only about the "hammer" testimony. In other words, Bentley's testimony that defendant showed him a photograph of defendant and Ziegler from "the day of the murder" and told Bentley, "We did it right after this picture," would still be in evidence, lending support for the jury's verdict of guilt.

-4-

Ziegler also testified that when Everson was placed in the camper, he had blood coming from his nose and his face was swollen, but there were no other signs of obvious injury. He testified that he heard Everson making noise from inside the camper, and that he and defendant thereafter drove a short distance away from the camper. According to Ziegler, defendant then exited the vehicle and grabbed something out of the back of the truck before going into the woods by the camper. The medical examiner testified that Everson had a tremendous amount of injuries, with broken facials bones, broken ribs, and leg contusions in addition to extreme trauma to the skull. He testified that Everson's cause of death was "blunt force trauma [to the] head."

Ziegler testified that the incident occurred on July 2, 2018. The medical examiner stated that the date of July 2, 2018, was within the estimated range of the time of death. Everson's mother also testified that she had last seen Everson on July 2; that she telephoned Everson on July 3, but he did not answer; and that she never heard from him again. Detective Sergeant Ryan Swope with the Crawford County Sheriff's Office testified that the last outgoing call on Everson's telephone was made on July 2. And, one of the victim's sons, Edward, testified that Everson did not call him on July 5, Edward's birthday, as he usually did. Edward could not reach him and went to Everson's home on July 6, only to find that he was not there. Edward saw moldy food and said that "the dog that was there tore up the couch and had gone to the bathroom all over the house because nobody was there to let him out." Edward also noted that Everson's telephone was "outside on the porch and part[s] of his glasses were outside" and scattered and that one shoe and Everson's hearing aid were on the ground.[6]

Ziegler further testified that defendant told him that he had broken one of his own (i.e., defendant's) toes during the fight and later showed the toe to Ziegler. Ziegler's sister testified that on July 4, 2018, defendant said that he had a broken toe and had been complaining about how badly it hurt. She testified that she asked what had happened to it, and defendant replied, "[O]h I kicked some old man up the . . . -ss."[7] She stated that defendant had told her that defendant and Ziegler were planning to stay up north a couple of months, and she did not know why they came back so early. She testified that she asked defendant about it and that he replied that "things just didn't go too well." An acquaintance of defendant's also testified that defendant told him that he and Ziegler got in a "fight" up north but, significantly, made sure to mention that the "person was alive when they left."

Ziegler also testified that, the day after the murder, defendant washed his truck, which was unusual. The police verified the carwash activity by way of a photograph. Ziegler testified that defendant bought new tires shortly after the murder and told Ziegler that he was doing it so that the "tire tracks" "couldn't be tracked." Detective Trooper Joseph Dowdell with the Michigan State Police testified that he visited the tire shop to obtain the receipt for the tires and learned that the

---

[6] Edward further stated that he had seen defendant get physical with Everson in the past. He alleged that he had heard "threatening things" from defendant toward Everson, involving a marijuana-growing arrangement.

[7] Everson was significantly older than defendant.

name defendant had given at the shop was "Mark Smith." Also, defendant had paid the tire shop to "scrap" the old tires.

Ziegler testified that when he told defendant that police were outside the house where Ziegler and defendant were located in southeastern Michigan, defendant left and headed toward Ohio. Detective Trooper Dowdell pulled defendant over when defendant was on his way to Ohio; the officer asked defendant what had happened up north, and defendant said that he had not been up north. The police verified by video and other means that defendant and Ziegler had, in fact, been up north on July 2, 2018.

In addition to Ziegler's corroborated testimony, there was strong scientific support that a stain on the hook of an orange tie-down taken from the camper contained the DNA (deoxyribonucleic acid) of Everson and defendant.[8] There was also strong scientific support that Everson's DNA was in stains found on one of the camper's walls and on the interior of the camper's door.

Finally, Detective Sergeant Swope interviewed defendant, and defendant acknowledged that there were only three people who knew how Everson died—Ziegler, Everson, and defendant. Defendant also, at that time, said, "I didn't do it." The implication was that Ziegler "did it." A person who knew both defendant and Ziegler, however, testified that defendant seemed to be "more in control" in the relationship. Another person who knew both defendant and Ziegler testified that defendant was always the one in control in the relationship, that Ziegler "always looked to [defendant]," and that defendant would "always tell [Ziegler] what to do." This person also testified that defendant told him that there had been a "fight" up north. A third witness testified that in the relationship between defendant and Ziegler, Ziegler "did what [defendant] said."

Based on the record, it is clear beyond a reasonable doubt that a rational jury would have convicted defendant even without any of Bentley's testimony or the prosecutor's comment in closing arguments (addressed below). *Shepherd*, 472 Mich at 347. Notably, the jurors were given an aiding-and-abetting instruction. The upshot is that even if the jurors believed that Ziegler dealt the fatal blow, there was a large quantity of evidence that defendant was, at the very least, an aider and abettor. Defendant was thus not entitled to a new trial.

---

[8] When asked about whether a strap had been used to tie Everson, Ziegler said only that he could not recall. He did not, contrary to defense counsel's implication at trial, state with definitiveness that a strap was not used. Also, he claimed that defendant and Everson were out of his view for a time after defendant had moved the truck and headed back toward the camper. And he testified that defendant "put [Everson] in the camper." At one point he seemed to be saying that he had never seen defendant step inside the camper, but the prosecutor, in questioning him at that point, was speaking about *before* the criminal incident. Shortly afterward, Ziegler reiterated that he saw defendant put Everson in the camper.

B. UNPRESERVED ARGUMENT THAT SUPPRESSION OF ALL BENTLEY'S TESTIMONY WAS REQUIRED ON THE BASIS OF THE STATE'S HAVING KNOWN THAT BENTLEY WAS A "REGULAR SNITCH"

Defendant argues in his supplemental brief that the information relayed by Bentley at all three interviews needed to be suppressed because the state knew from the very start that Bentley had been a "snitch" for other cases and that the mere fact of the state's having placed defendant in the same jail unit with a known snitch was a sufficient basis for a conclusion of agency. Defendant contends that the state clearly intended to use Bentley as an agent by placing the two together from the very start. The problem with defendant's argument is that defense counsel affirmatively conceded at the suppression hearing that the defense was not arguing that defendant and Bentley were "originally" placed together "to gain information." Counsel argued that Bentley only became an agent after the first interview. This constituted a waiver of the argument defendant is now making. See *People v Hershey*, 303 Mich App 330, 350; 844 NW2d 127 (2013).

Moreover, defendant, in making his argument about Bentley's "known" status as an informant, is primarily relying on *United States v Henry (After Remand)*, 447 US 264; 100 S Ct 2183; 65 L Ed 2d 115 (1980). But in that case, the informant was acting as a government agent by way of a paid, prearranged agreement. See *id*. at 270-271, 273.[9] At any rate, defendant appears to be conceding that his "known informant" issue was not raised below. Indeed, he argues that defense counsel was ineffective for failing to raise it. Given the evidence of defendant's guilt as provided by witnesses other than Bentley, no outcome-determinative error is apparent under the standard from *Carines*, 460 Mich at 763.

Defendant additionally argues that counsel improperly failed to object to the entirety of Bentley's testimony on the basis of Bentley's previous "snitching" actions and that counsel should have raised this issue in the motion for a new trial. However, to obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). Given all the evidence as set forth above in discussing the issue of a preserved, constitutional error, defendant has not demonstrated a reasonable probability that the outcome of the trial would have been different even if counsel had raised the argument below and had been successful with it.

---

[9] Defendant also states that the present case is "exactly" comparable to *Ayers v Hudson*, 623 F3d 301 (CA 6, 2010). *Ayers* does bear a lot of similarity to the present case, but in *Ayers*, *id*. at 316, the court, in analyzing the relationship between the police and an informant, relied in significant part on the fact that the police had shared details of the defendant's case with the informant before the informant obtained crucial information from the defendant, and defendant points to no such sharing here. In addition, *Ayers* does not really speak to defendant's "known snitch" issue.

## C. UNPRESERVED ARGUMENT THAT PROSECUTORIAL ERROR OCCURRED

Defendant makes an additional unpreserved argument that the prosecutor committed error by eliciting the "hammer" testimony and by mentioning it in closing arguments. In general, this Court reviews claims of prosecutorial error to determine whether "the prosecutor committed errors during the course of trial that deprived [the] defendant of a fair and impartial trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). However, unpreserved issues of prosecutorial error are reviewed under the plain-error doctrine from *Carines*, 460 Mich at 763-764. *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).

Although prosecutorial error cannot be based on a good-faith attempt to introduce evidence, see *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007), it could be argued that the prosecutor should have been more diligent in assessing what questions to ask of Bentley, in order to comply with the trial court's pretrial ruling, of which she was obviously aware. However, given all the evidence of guilt even disregarding the "hammer" testimony, no outcome-determinative error occurred. *Carines*, 460 Mich at 763. In raising the issue of prosecutorial error, defendant is focusing only on the testimony about the hammer and not on Bentley's testimony regarding defendant's having allegedly told Bentley that he and Ziegler had killed Everson right after the taking of a "selfie" photograph. Accordingly, the evidence of defendant's guilt was even stronger in this context than set forth above in the analysis pertaining to Bentley's testimony as a whole, because the "photograph" testimony is additional evidence of guilt. Finally, the very brief comment about the hammer made by the prosecutor in closing[10] was also not outcome-determinative in light of all the evidence of guilt aside from the testimony about the hammer.

## III. INEFFECTIVE ASSISTANCE ON THE BASIS OF A FAILURE TO CALL WITNESSES

Defendant contends that his trial counsel rendered ineffective assistance of counsel by failing to present testimony from two witnesses who allegedly saw Everson alive after June 2, 2018. We disagree.

As previously stated, to obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, *there is a reasonable probability that the outcome of the . . . trial would have been different*." *Ackley*, 497 Mich 389 (quotation marks, citation, and brackets omitted; emphasis added).

At trial, three witnesses testified that they might have seen Everson after July 2, 2018, but all three were unsure about this. Defendant contends that an additional two witnesses would have provided better and more credible support for the argument that Everson did not die on July 2, 2018, as alleged by Ziegler. Defendant has pointed to no *evidence*, however, that these two witnesses saw Everson after July 2 or that they would have testified as such at trial. A defendant

---

[10] The prosecutor said in closing that defendant told Bentley that "you have no idea how hard it is to kill someone with a hammer."

"has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel[.]" *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> A convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately. [*Id*. (quotation marks and citation omitted).]

Defendant has not proven any claim regarding these witnesses and has presented no evidence in support of his related claim that Everson would be depicted on video footage from July 4, 2018. He has established no entitlement to reversal.

Defendant also argues that he is entitled to a remand to develop this issue further. MCR 7.211(C)(1)(a) states that a motion to remand "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing." Even if defendant's supplemental brief is regarded as a "motion" for a remand, defendant has submitted no affidavits and no offers of proof aside from very brief and generalized statements in his supplemental brief that two witnesses had "seen" Everson. And the generalized statements are from *defendant*, not from the alleged witnesses.[11] A remand is not warranted.

Affirmed.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford

---

[11] Given all the evidence presented, it is difficult to conclude that a reasonable juror would have found credible any assertion by a witness that he or she had seen Everson after July 2.