# IN THE COURT OF APPEALS OF IOWA

No. 13-0739
Filed June 10, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**JUSTIN ALEXANDER MARSHALL,**
     Defendant-Appellant.

_____

     Appeal from the Iowa District Court for Johnson County, Sean W. McPartland, Judge.

     Defendant appeals his conviction for murder in the first degree. **REVERSED AND REMANDED.**

     Kent A. Simmons, Davenport, for appellant.

     Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Janet M. Lyness, County Attorney, and Meredith Rich-Chappell, Assistant County Attorney, for appellee.

     Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, P.J.**

Defendant Justin Marshall appeals his conviction for murder in the first degree. During trial, Marshall moved to suppress the testimony of confidential informants on the ground he was entitled to the assistance of counsel at the time he spoke to them in jail. Marshall appeals the denial of that motion. We determine the district court should have granted the motion to suppress as to one of the informants. We are unable to conclude the error was certainly harmless, and therefore, do not engage in a sua sponte harmless-error review.

Marshall also argues there was not substantial evidence in the record to support the submission of instructions on the theories of aiding and abetting and joint criminal conduct. We decide this issue as it is likely to reoccur on retrial and conclude the instructions were supported by the evidence. We reverse Marshall's conviction for first-degree murder and remand to the district court.

## I. Background Facts & Proceedings

On October 8, 2009, John Versypt, the owner of several apartment buildings, was killed at the Broadway Condominium complex in Iowa City. On August 1, 2011, almost two years after the murder, Marshall was charged with murder in the first degree. Pending trial, he was held in the Muscatine County, Iowa, jail. A jury trial commenced in January 2013.

At the time of Versypt's death, Marshall lived with Charles Thompson in one of Versypt's apartment buildings. Thompson stated he heard a loud noise on October 8, 2009. A few minutes later, Marshall came into his room and was "frantic." Thompson saw Marshall putting some pants in a garbage bag, and

then he and Marshall took the bag out to a dumpster. There is videotape from a squad car showing Marshall and Thompson taking some garbage bags out to a dumpster. Thompson denied being involved in the robbery or shooting of Versypt, but eventually pled guilty to being an accessory after the fact.[1]

Shawnta Jackson, another tenant, saw Marshall talking to Courtney White, known as Mow-Mow, outside the back door of the apartment building. When Jackson was returning to her apartment from the basement level with her laundry, she saw Versypt, who had been shot, lying on the back stairs.

Another tenant, James Brown, stated that the night before the shooting, on October 7, 2009, he saw a gun with a brown handle in the next-door apartment where Marshall and Thompson lived. Then sometime between 3:30 and 4:00 in the afternoon of October 8, he heard a "loud pop in the hall." Brown stated that shortly after he heard the "loud pop," he heard the downstairs back door "bust open real quick," but did not see anyone. A few minutes later he heard Marshall softly knocking on the door of his apartment, asking his aunt to let him in.

Soon after the shooting, Andrew Shepard came out of his apartment and saw a gun and a wallet were lying on the floor by Versypt's body. He then called the police. Shepard testified that a day or so after the incident Marshall asked him what kind of a gun had been used, and when Shepard stated a camouflage .38, Marshall responded he had a gun just like it.

---

[1] Thompson was tried for murder in the first degree for killing Versypt, but a mistrial was declared during his criminal trial.

Marshall claimed he had been in Shepard's apartment at the time of the shooting, but Shepard denied he was there then. Shepard agreed with police to wear a wire[2] when meeting with Marshall. Marshall told Shepard the victim had been shot in the head. The information of where Versypt had been shot was not public knowledge at the time. Marshall also told him, "it might have been a conflict gone wrong."

In an interview with officers on October 9, 2009, Marshall stated Thompson and White planned to rob Versypt. Marshall stated that after the shooting Thompson "was panicked, he was crying, he was fidgety, and all he could say was this sh*t's crazy over and over and over." He also stated he heard Thompson on the telephone saying he "hit a lick. It wasn't that good of a lick. It went wrong. Things went wrong."[3] Marshall told the officers Versypt had been shot in the face.

Officers reviewed telephone records but were unable to corroborate Marshall's statements about a telephone call made by Thompson after the shooting. Officers obtained some clothing from Marshall. Analysis of his jacket with a scanning electron microscope showed gunshot residue.

During the trial Marshall learned that Carl Johnson, Antonio Martin, and Earl Freeman, fellow inmates at the Muscatine County Jail, had provided to law enforcement certain statements he had made to them while they were in jail. Marshall immediately moved to suppress any statements he had made to the informants while he was in jail. He claimed they were confidential informants

---

[2] A wire is a concealed listening device used by law enforcement.
[3] An officer testified a "lick" was a slang term for a robbery.

acting as agents of the State, and therefore, he was entitled to counsel while discussing the case with them. Marshall asserted that because he had been denied his constitutional right to counsel, the statements of these witnesses should be suppressed.

Outside the presence of the jury, Iowa City police officers Michael Smithey and Jennifer Clarahan testified that while they may have asked the informants if they "had information about any circumstances surrounding the death of John Versypt," they did not ask them to obtain information or do anything further on behalf of the State. Additionally, the officers stated they had not arranged for the informants' jail cell placements to be in the vicinity of Marshall.

The district court ruled from the bench, stating:

> Well, I have had a chance to review the standard, and I'm going to overrule the motion to suppress and allow the witnesses to testify. The case law suggests that an informant becomes a government agent for purposes of the test only when the informant has been instructed by the police to get information about a particular defendant. The defendant must demonstrate that the police and their informant took some action beyond merely listening that was designed deliberately to elicit incriminating remarks.
> . . . .
> The primary—the cases indicate that the primary concern of those decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. The Sixth Amendment is not violated, however, whenever, by luck or happenstance, the State obtains incriminating statements. I think this case presents just the sort of luck or happenstance that resulted in these gentlemen coming forward and providing information to the State based on what they alleged to have been statements made by Mr. Marshall.

The State then recommended presenting evidence to the jury. Earl Freeman testified Marshall approached him at the Muscatine County Jail and asked him to help write a motion requesting new counsel. They discussed

Marshall's wish to have his charges dropped from murder to manslaughter. Freeman testified that during this discussion, Marshall told Freeman,

> He went to rob him. John grabbed for the gun. The gun went off, shot him in the hand, shot him in the head. He fell in the door or on the ground, on the ground in the doorway or something like that, and he wiped the gun off the front of his jacket and he took off.

Marshall asked Freeman to tell his attorney that Marshall had confessed to the shooting, but it was an accident. Freeman stated Marshall indicated he had not taken anything out of Versypt's wallet. He also stated Marshall told him no one else was involved in the plan to rob Versypt. Freeman testified that after Marshall started to admit to the offense, "I did push him to tell me information." After gathering the information from Marshall, Freeman contacted the Iowa City Police Department and in early October 2011, he and his attorney met with the police investigators. Freeman testified at the time of trial he was serving prison time on federal charges for conspiracy to manufacture methamphetamine and he was hoping to get some time off of his sentence for providing information and testimony in this case. He was, however, never under a proffer agreement or any other agreement to gather or provide information to law enforcement officials.

Carl Johnson testified he knew Marshall because they both had lived at the Broadway Condominium complex. Shortly after the shooting, Marshall told Johnson that Thompson had shot Versypt. Johnson was arrested in November 2010 and was being held in the Muscatine County Jail on federal charges for distribution of cocaine. He was facing a sentence of twenty years to life. As part of a plea agreement, he had signed a proffer agreement with federal officials to

cooperate and assist in the investigation of other individuals. If he failed to provide substantial evidence and truthful information, the plea agreement would be withdrawn. As a part of the proffer agreement and his plea agreement, he testified against his co-defendant on the cocaine charges. He pled guilty in February 2011. While he was in jail awaiting sentence, he and his attorney met with Officers Smithey and Clarahan on July 12, 2011—the same day the arrest warrant for Marshall was issued—for a proffer interview and discussed the John Versypt case. Smithey asked Johnson to provide information concerning Charles Thompson, Justin Marshall, and Courtney White. At that time Johnson was in segregation for violating jail rules. Within days, Marshall was arrested in Texas and transported to Iowa, where he was held at the Muscatine County Jail. Around August 2011 Johnson saw Marshall, who had also been placed in segregation. When Johnson was out of his cell—one hour a day—he engaged Marshall in conversation. In the course of those conversations, Marshall told Johnson that he wanted to rob the landlord, but it went wrong and the landlord got shot.

Johnson took notes of what Marshall told him so he could provide accurate information when he and his attorney had an interview with officer Smithey at the Muscatine County Jail in September 2011. Johnson testified that while they were in jail Marshall told him that he, "Weezy [Thompson], and Calvin was in the hallway, they was all in the hallway playing dice. After a while Charles Thompson left and went inside his apartment. That's when he came up with the idea that he wanted to rob the landlord." Marshall told Johnson, "he wanted to

rob the landlord because he knows some people pay with money and some pay with cash." He told Johnson the robbery went wrong and the landlord got shot. Johnson further testified:

> All he said was it was real—the shot was loud. It was loud in the hallway, and that kind of like froze him up, and after that he ran out the back to get away from the scene. He came back around, knocking on the front door, but he was whispering a little bit because he didn't want nobody to know he was in the hallway.

Johnson stated Marshall told him Calvin was "with him when he was going to do the robbery," but Johnson did not know specifically who this was.

Johnson had received a substantial reduction in his federal drug sentence as a result of testifying against his co-defendant. Although he had already been sentenced when he testified in this case, he testified that he hoped to get a further reduction of his sentence because of this testimony; but he knew there was no guarantee.

Antonio Martin, a co-conspirator of Johnson, was also arrested in November 2010 and was being held at the Muscatine County Jail during part of Marshall's incarceration there. At the time of trial, Martin testified he was serving a sentence of twelve years and one month on federal charges of selling cocaine and possession of a firearm. When he was charged with those offenses he was facing a sentence of between twenty-seven and thirty-two years. Like Johnson, he had also entered into a cooperation agreement to provide truthful information to government officers in hopes of gaining favorable sentencing concessions, and, like Johnson, had pled guilty in February 2011. Martin's cooperation agreement with the government also contained no promises of any particular

sentencing concession; the agreement was simply that Martin might get a favorable recommendation from the prosecutor if he provided truthful information that assisted law enforcement. He testified against a fellow drug dealer and ultimately received a fifteen-year reduction in his sentence.

Like Johnson, Martin knew Marshall from having lived in the Broadway neighborhood around the time of Versypt's murder. Martin was also held in the Muscatine County Jail pending his federal charges when Marshall was arrested and jailed in Muscatine County. But unlike Johnson, Iowa City police did not meet with Martin concerning the Versypt murder before Martin began to engage Marshall in conversation concerning the murder.

When Martin first began to talk with Marshall about the murder charge, Marshall denied even being at the scene. Eventually, he told Martin it was a robbery. Marshall discussed with Martin his idea to try to get his first-degree murder charge reduced to manslaughter. Marshall wrote down his story and planned to have Martin act as a jailhouse snitch to get his story out: a plan that Marshall was led to believe might help them both with the legal issues.

In the process, Marshall told Martin the bullet went through the victim's hand and through his face. He also stated there was a wallet next to the body and no money had been taken from the wallet. In his written version, Marshall stated he had a gun with him because he was going to sell it, when somebody came up behind him he got scared and pulled out the gun, which went off. Marshall stated he dropped the gun, then picked it up and wiped off his

fingerprints, then dropped it again. Marshall told Martin he changed his clothes, put the clothing he had on in a garbage bag, and threw them away.

Martin took notes of what Marshall told him. As a part of the supposed plan to assist Marshall with getting his manslaughter story out, Marshall let Martin take his writings to a meeting with Martin's attorney on October 3, 2011. While meeting with his attorney, officer Smithey of the Iowa City Police Department entered the room. Martin then told Smithey what he had learned and showed him what Marshall had written. Smithey made a copy and returned the original to Martin so Martin could return it to Marshall.[4] Smithey ultimately used the information to get a search warrant of Marshall's jail cell, where he found most of the original notes—but torn into pieces—that Marshall had written.

Although Martin was already serving his sentence at a federal penitentiary at the time he testified in this case, the federal system apparently allows for additional reductions in the sentence already imposed. Martin testified that he had not received any kind of promise about a specific reduction he could receive for testifying in this case. But when asked, "Is it your hope that you may get some kind of reduction?" he answered "yes."

Marshall now appeals the denial of his motion to suppress the information obtained from Freeman, Johnson and Martin.

Marshall objected to the instructions on aiding and abetting and joint criminal conduct on the ground that the evidence did not support these instructions. He asserted there was insufficient evidence there was a second

---

[4] Marshall did not know Martin met with Smithey on that day.

person involved. The court overruled Marshall's objections to the jury instructions. The jury found Marshall guilty of first-degree murder. The district court denied Marshall's joint motion in arrest of judgment and for a new trial. Marshall now appeals these rulings.

## II.     Confidential Informants

Marshall contends the State's use of informants to induce statements from him violated his Sixth Amendment right to counsel.[5] He claims the informants were acting as agents for the State at the time he talked to them at the Muscatine County Jail. He argues that after the officers requested information from Johnson within hours after Marshall was charged with murder, Johnson began to work for them. He also argues the officers must have known Johnson would relate the request for information to Freeman and Martin, thus converting them to agents as well. He asserts he was prejudiced by the testimony these three confidential informants gave when reporting statements that were attributable to Marshall. Our review of constitutional issues is de novo. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013).

In the case of *Massiah v. United States*, 377 U.S. 201, 202-03 (1964), after the defendant had been charged with possession of narcotics, his codefendant decided to cooperate with government agents and agreed to wear a wire while discussing events with the defendant. The United States Supreme

---

[5] Marshall also raises a claim under the Iowa Constitution. This issue was not raised before the district court nor decided by the court. Because error was not preserved on this issue, it will not be addressed in this portion of the opinion. *See State v. Paulsen*, 293 N.W.2d 244, 247 (Iowa 1980) (noting even constitutional issues must be specifically raised in the district court).

Court determined the defendant had been denied his constitutional right to counsel, "when there was used against him at his trial evidence of his own incriminating words, which federal agents had *deliberately elicited* from him after he had been indicted and in the absence of counsel." *Massiah*, 377 U.S. at 206 (emphasis added).

The issue was addressed in *United States v. Henry*, 447 U.S. 264, 266 (1980), where shortly after the defendant was incarcerated government agents contacted a fellow inmate who was a paid confidential informant. The paid informant was told, "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." *Henry*, 447 U.S. at 266. The Court noted, "according to his own testimony, [the informant] was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" *Id*. at 271. The Court also noted that in discussing the situation with the paid informant the government agent had "singled out Henry as the inmate in whom the agent had a special interest." *Id*. at 271 n.8. The court concluded defendant's statements to the paid informant should not be admitted at trial because the defendant had been denied his Sixth Amendment right to counsel. *Id*. at 274.

The issue was again considered in *Maine v. Moulton*, 474 U.S. 159, 165-66 (1985), where a codefendant agreed to wear a wire, then met with the defendant and extensively discussed their pending charges with him, stating he could not remember certain events and asking the defendant about them. The

Court found that engaging the defendant "in active conversation about their upcoming trial was certain to elicit statements that Moulton would not intentionally reveal . . . to persons known to be police agents." *Moulton*, 474 U.S. at 177 n.13. The Court concluded, "By concealing the fact that [the codefendant] was an agent of the State, the State denied Moulton the opportunity to consult with counsel and this denied him the assistance of counsel guaranteed by the Sixth Amendment." *Id.* at 177. The court determined the defendant's statements should be suppressed. *Id.* at 180.

In *Kuhlmann v. Wilson*, 477 U.S. 436, 439 (1986), officers had an informant placed in the respondent's jail cell and told the informant not to ask respondent any questions, but to "simply 'keep his ears open.'" When the respondent began to talk about the offense, the informant told him his story "didn't sound too good." *Kuhlmann*, 477 U.S. at 439-40. Respondent then made incriminatory statements. *Id.* at 440. The United States Supreme Court stated:

> As our recent examination of this Sixth Amendment issue in *Moulton* makes clear, the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459 (citation omitted). The Court concluded the officers had not "deliberately elicited" the respondent's statements. *Id.* at 460.

The Eighth Circuit has had occasion to consider the informant status of a jail inmate who is under a proffer agreement and who gathered incriminating information about a fellow inmate who had not been identified to proffer-inmate by law enforcement. *See Moore v. United States,* 178 F.3d 994, 999-1000 (8th Cir. 1999). While housed in a county jail on drug charges, inmate Hartwig signed an agreement with federal authorities to provide information concerning drug-related criminal activity. *Id.* at 999. Over the next few weeks Hartwig overheard inmate Moore talking about some details of a car theft and bank robbery. *Id.* No one asked Hartwig to listen in on or solicit information from Moore. *Id.* A few weeks later, when meeting with law enforcement pursuant to his agreement, he provided what he had learned about Moore. *Id.* The court explained:

> "[A]n informant becomes a government agent for purposes of [*Massiah*] only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir. 1997) (collecting cases). To the extent there was agreement between Hartwig and the government, there is no evidence to suggest it had anything to do with Moore. The proffer agreement simply evidenced Hartwig's willingness to disclose his knowledge of drug activity in hopes of receiving a more favorable plea agreement. . . . We find that the link between Hartwig's relationship with the government and his conduct at issue here is insufficient for his actions to be attributable to the government for purposes of a *Massiah* violation.
> There is also no evidence that Hartwig did anything but act as a passive listening post in gathering this information. In *Kuhlmann v. Wilson,* 477 U.S. 436 (1986), the Supreme Court made clear that the "primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation . . . 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements.'" *Id.* at 459 (citing *United States v. Henry,* 447 U.S. 264, 276 (1980)) (Powell, J., concurring). "[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459. In

this case, Moore has not alleged anything to suggest he was subject to any improper or surreptitious interrogation.

*Id.* at 999-1000.

In a Sixth Circuit case, the court conditionally granted a writ of habeas corpus to Ayers, who had been convicted of murder. *Ayers v. Hudson,* 623 F.3d 301, 311-12 (6th Cir. 2010). The court reasoned:

> We agree with those courts that do not limit agency in the *Massiah* context to cases where the State gave the informant instructions to obtain evidence from a defendant. As *Henry* illustrates, a *Massiah* violation can occur even where the State specifically instructs its informant "*not* to initiate any conversation with or question [a defendant] regarding the [offense for which he had been indicted]." *Henry,* 447 U.S. at 266 [(1980)] (emphasis added). "[I]t is not the government's intent or overt acts that are important; rather, it is the 'likely . . . result' of the government's acts." *Randolph v. California,* 380 F.3d 1133, 1144 (9th Cir. 2004) (quoting *Henry,* 447 U.S. at 271). Thus, we hold that although direct written or oral instructions by the State to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor. A court must also analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency. *See Henry,* 447 U.S. at 271 (indicating that a "combination of circumstances is sufficient to support" a finding of agency); *Moulton,* 474 U.S. at 176; *see also* [*United States v.*] *Brink,* 39 F.3d [419,] 423–24 [(3rd Cir. 1994)] (suggesting that a "tacit agreement" may be sufficient to establish agency for *Massiah* purposes). To hold otherwise would allow the State to accomplish "with a wink and a nod" what it cannot do overtly. This, the Sixth Amendment does not permit.

*Ayers*, 623 F.3d at 311-12 (footnote omitted).

This issue was addressed in Iowa in *State v. Nelson*, 325 N.W.2d 118, 119 (Iowa 1982), where the defendant was incarcerated in a cell adjacent to inmate Jackson and made inculpatory statements to Jackson about charges he was facing. Jackson slipped a note to the jailer stating he wanted to discuss the

incriminating statements with police officers. *Nelson*, 325 N.W.2d at 119. As a result, a deputy sheriff spoke to Jackson and told Jackson he would contact the officer in charge of investigating the defendant's case. *Id.* No promises were made or directions given to Jackson. *Id.* When Jackson returned to his cell he engaged in extensive conversations with the defendant, gathering information that was very damaging. *Id.* Two days later, the deputy met again with Jackson after the deputy had met with a DCI agent and a police captain. *Id.* At that second meeting, the deputy and Jackson discussed Jackson working for the State on unrelated cases. *Id.* Later that night, Jackson and the defendant talked and defendant confessed. *Id.* Two days later, Jackson was released from jail in order to work for the State on unrelated cases. *Id.* at 120.

The district court suppressed the defendant's confession made to Jackson after the second meeting with the deputy. *Id.* The trial court concluded that by that time, Jackson had "assumed the role of a state agent unknown to the defendant." *Id.* The court relied on *Henry*, 447 U.S. at 270, and *Massiah*, 377 U.S. at 206. The incriminating statements made by the defendant to Jackson prior to that second meeting were, however, admitted at trial. *Id.* Defendant Nelson was convicted, then appealed claiming all of Jackson's testimony of statements made by Nelson should have been suppressed. *Id.* The Iowa Supreme Court determined Jackson did not qualify as a state agent prior to the second meeting with the deputy. *Id.* The court noted at that time Jackson did not have an ongoing relationship with the State as a paid informant, there was no agreement he would be paid or would receive more favorable treatment for the

information, and Jackson initiated the contact with the State. *Id.* The court concluded it was "only a coincidence that [the informant] ended up in a cell close in proximity to Nelson. Because [the informant] was not thus working for the State it cannot be said that the statements were deliberately elicited." *Id.* Therefore, Jackson could properly testify at the defendant's trial about the defendant's statements to him prior to the second meeting with the deputy. *Id.*

In the present case, officer Smithey knew Johnson from Smithey's days as a patrol officer and as a drug task force officer, and knew Johnson was then in custody on federal drug charges. He knew Johnson had pled guilty and had entered into a cooperation agreement with federal prosecutors. Pursuant to that cooperation agreement, Smithey met with Johnson and Johnson's attorney on July 12, 2011, to find out if Johnson "had information about any circumstances surrounding the death of John Versypt." Officer Smithey requested that Johnson contact him if he learned anything. On cross-examination, Smithey admitted he asked Johnson to provide information concerning Charles Thompson—also known as Weezy—Courtney White, and Justin Marshall. At the request of Johnson's counsel, officer Smithey met with Johnson again on September 13, 2011. At that meeting, Johnson conveyed valuable information of admissions by Marshall that he had been involved in the attempted robbery and the shooting of Versypt.

The officer met with Freeman on October 3, 2011, and Freeman then provided him with information he had obtained prior to that date. Smithey told Freeman to contact him if he had "additional information he wished to relay."

Officer Smithey also met with Martin on October 3, 2011. He stated he may have previously asked Martin, "do you know any information about this?" Johnson, Freeman, and Martin were in the Muscatine County Jail, where Marshall was also being held, but officer Smithey stated he made no arrangements for them to be jailed in the same vicinity as Marshall.

Officer Jennifer Clarahan testified she was present at the meeting with officer Smithey, Johnson, and Johnson's attorney on July 12, 2011. She stated she did not request Johnson to obtain other information or do anything further on behalf of the State. Officer Clarahan received letters from Freeman that were dated September 21, 2011, and October 26, 2011. Freeman also called her on October 1, 2011, and stated he had information about the Versypt murder. Clarahan was with Smithey when he met with Freeman on October 3, 2011, and Freeman provided them with information he had learned from Marshall. She said Freeman was not asked to do anything else on behalf of the State. Officer Clarahan never met with Martin.

We first consider whether Marshall's Sixth Amendment rights were violated as to communications between Johnson and Marshall. In *Massiah*, the informant agreed to cooperate with the government and then wore a wire while deliberately eliciting information from the defendant, and the testimony was suppressed. *Massiah,* 377 U.S. at 206. In *Henry*, government agents contacted a paid confidential informant and told him to be alert to statements of fellow prisoners but not to initiate conversation; the inmate was not a passive listener but engaged in conversation, and the testimony of the confidential informant was

suppressed. *Henry,* 447 U.S. at 266-274. In *Moulton*, a codefendant agreed to wear a wire and engaged the defendant in active conversation, and the codefendant's testimony was suppressed. *Moulton,* 474 U.S. at 176-80. In *Kuhlmann*, the informant followed the instructions of law enforcement that he "at no time asked any questions" of the accused, and that he only listen to spontaneous and unsolicited statements. *Kuhlmann*, 477 U.S. at 460. This did not constitute a Sixth Amendment violation. *Id.*

In *Moore*, a fellow inmate subject to an agreement with authorities to provide information concerning drug activity overheard inmate Moore give details of a car theft and bank robbery. *Moore*, 178 F.3d at 998-99. The informant was a passive listener who by luck or happenstance obtained incriminating statements, so there was no violation of the Sixth Amendment. *Id.* at 1000. In *Ayers*, the informant met with law enforcement, then deliberately elicited information from Ayers regarding the crime. *Ayers*, 623 F.3d at 315-16. The court reasoned that even in the absence of an express agency arrangement, a Sixth Amendment violation can and did occur as a result of circumstances intentionally created by the State that were likely to violate Ayers's Sixth Amendment rights and concluded Ayers's Sixth Amendment rights were violated. *Id.* at 315-16. In *Nelson*, a fellow inmate obtained inculpatory statements from the defendant, then contacted law enforcement and an agreement was reached that he would work for the State as a paid informant. *Nelson*, 325 N.W.2d at 119. Statements made before the agreement were admissible, while statements made after were in violation of the Sixth Amendment. *Id.* at 120.

There is no question that Smithey told Johnson he was interested in information concerning Thompson, White, and Marshall in connection with the Versypt murder. There is no question Johnson was under a cooperation agreement with federal prosecutors under which Johnson expected that if he provided valuable information about the Versypt murder that he might receive a favorable sentencing recommendation from the federal prosecutor. There is no question that Smithey knew Johnson was under a cooperation agreement, had already pled guilty and was awaiting sentencing; and that under the cooperation agreement Johnson (1) would be required to provide to Smithey any information he had concerning the Versypt murder, (2) would suffer negative consequences if he failed to provide any information he had concerning the Versypt murder, and (3) had the potential of a favorable sentencing recommendation if he provided helpful, truthful information concerning the Versypt murder.

Johnson was not a paid informant. He was under no arrangement for which there was any agreement that he would get a charging or a sentencing concession. But to say Johnson did not or should not have expected something in return for his cooperation and assistance belies the obvious facts. The cooperation agreement he had with the federal authorities required that he cooperate with all law enforcement and that he provide truthful information. The cooperation agreement contained no binding consideration on the government's side, leaving the consideration solely in the discretion of the government and the court. The obvious, and rather effective objective, was to induce maximum effort and truthfulness from Johnson and remove any ability to negotiate the value of

certain information. The inducement effectively encouraged Johnson to gather as much information as he could that might be considered helpful to law enforcement in hopes of obtaining a favorable report that could lead to a reduced sentence. It is the probability of valuable information that gave value to the government, and the possibility of a sentencing concession that gave value to Johnson.

Before his federal court sentencing hearing, Johnson gathered and provided to Smithey information obtained from Marshall. By the time of that hearing, he had also testified against one of his federal co-conspirators. At sentencing, he received a substantial reduction in his sentence. He fully expected that if he testified against Marshall he might still receive additional sentencing concessions as a direct result of his cooperation with Smithey and the Iowa City police.

Smithey was fully aware of how the cooperation agreements worked. The same lack of specificity in the terms of the agreement that were for the benefit of the federal government also were for the benefit of the State. It was not necessary for Smithey or Johnson to discuss the value that would be received by Johnson's cooperation. The value for Johnson was the expectation of a favorable report to the federal authorities concerning his cooperation with the State.

Smithey testified that he knew incarcerated individuals had certain rights that should not be bypassed by instructing informants on what information to find or how to go about it. The State asserts Smithey did not cross the line. But

clearly Smithey did not tell Johnson to be a passive listener, nor did he communicate anything close to that. On our de novo review, we find that effective communication abounded. There were no misunderstandings. Smithey knew there was a line he should not cross, and we have no reason to believe he intentionally crossed it. But, we find that he did cross that line. Johnson was not a paid informant—not paid in cash. Johnson reasonably expected the opportunity for a sentencing concession. Smithey did not tell Johnson to interrogate Marshall, but asking him to gather information, in light of the valuable consideration at issue, communicated effectively that the more information he could get from Marshall the better.

A smile, a frown, crying, laughter, a pat on the back, a thumb up (or down), a salute, an obscene gesture, and a wink and a nod are all examples of effective communication without a spoken word.

> A court must also analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency. . . . To hold otherwise would allow the State to accomplish "with a wink and a nod" what it cannot do overtly. This, the Sixth Amendment does not permit.

*Ayers,* 623 F.3d at 311-12.

Smithey told Johnson the crime at issue. Smithey told Johnson the three individuals about whom the police wanted him to gather information. Johnson knew that if he obtained information from Marshall that was helpful to police, a favorable report of his cooperation would be sent to federal prosecutors. He and Smithey knew a favorable report had the potential for a sentencing concession.

From the foregoing, it is clear Smithey expected Johnson to perform, and Johnson did. The facts and circumstances demonstrate an implied agreement that Johnson would perform the task that Smithey wanted. What we had here was *not* a failure to communicate; expectations could not have been much clearer. We find that when Johnson solicited information from Marshall after July 12, 2011, Johnson was an agent of the State of Iowa.

Accordingly, all statements made by Marshall to Johnson after the July 12, 2011 meeting should have been suppressed as having been made in violation of Marshall's Sixth Amendment right to counsel.

The evidence shows that Freeman and Martin had not met with Iowa City police before gathering information from Marshall. Marshall's argument that they were acting as agents fails to satisfy the requirements of the *Massiah* line of cases, requiring some evidence of an express or implied agreement prior to soliciting information. Marshall seems to argue that Johnson, as an agent of the State, must have communicated with Freeman and Martin and effectuated their status as agents of the State. First, there was no testimony from Johnson, Freeman, or Martin that would support such a conclusion. Second, we are not willing to speculate or assume that Johnson was authorized to or did initiate such communications, even indirectly. The informants were not asked to deliberately elicit information from Marshall, or do anything more than provide information they heard. The officers did not do anything to place the informants in the same vicinity as Marshall. It is not unexpected that Freeman and Martin, given their circumstances of facing long prison sentences, might try to curry favor with law

enforcement in hopes of improving their situation. What is missing, however, is a prior agreement. We conclude the district court properly ruled Freeman and Martin were not acting as agents of the State at the time Marshall talked to them about his case. We agree with the court's statement in its ruling on the motion for new trial that Freeman and Martin "collected information prior to and without being approached by the police and later turned it over to the officers." We determine Marshall's motion to suppress the testimony of Freeman and Martin was properly denied.

## III. Harmless Error

When evidence has been admitted in violation of a defendant's Sixth Amendment rights, reversal of the defendant's conviction is not required if the error is harmless. *State v. Peterson*, 663 N.W.2d 417, 430 (Iowa 2003). The parties, however, have not raised the issue of harmless error in the appellate briefs. The Iowa Supreme Court has stated courts may cautiously exercise discretion in engaging in sua sponte harmless-error review. *In re Det. of Blaise*, 830 N.W.2d 310, 320 (Iowa 2013). Factors to be considered are: (1) the length and complexity of the record; (2) whether the harmlessness of the error is certain or debatable; and (3) whether a reversal will result in protracted, costly, and ultimately futile proceedings in district court. *Id.* at 319. The second factor—"the extent to which the harmlessness of the error is open to question"—has been considered the chief factor. *Id.* at 320 (citing *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1101 (9th Cir. 2005); *Lufkins v. Leapley*, 965 F.3d 1477, 1482-83 (8th Cir. 1992); *United States v. Pryce*, 938 F.2d 1343, 1348 (D.C. Cir. 1991)).

In examining these three factors, we first note the record is fairly lengthy and complex in this case. Including jury selection and jury deliberations, the trial took eleven days. There were twenty-eight witnesses and 111 exhibits during the trial. On the other hand, this case does not involve complex legal issues.

We turn to the second factor, whether the harmlessness of the error in admitting Johnson's testimony about Marshall's statements after he met with officer Smithey on July 12, 2011, is certain or debatable. Johnson is the only witness who testified that Marshall, Thompson, and Calvin were in the hallway playing dice, and then Thompson went inside his apartment. According to Johnson, "that's when [Marshall] came up with the idea that he wanted to rob the landlord." Johnson stated Marshall told him Calvin was with him when he was going to do the robbery. This is also the only evidence linking Calvin to the crime. Johnson stated he did not know which "Calvin" Marshall was referring to.[6] Additionally, Johnson is the only witness who testified that Marshall told him the shot was loud. Johnson testified Marshall told him that after the shooting he ran out the back way, then came back, "knocking on the front door, but he was whispering a little bit because he didn't want nobody to know he was in the hallway." This last statement corroborates testimony from Brown that a few minutes after hearing a "loud pop," he heard Marshall quietly knocking on the door of his apartment, asking his aunt to let him in.

---

[6] It is not clear from the record whether "Calvin," was someone's first name, last name, or a nickname. When asked if he knew Calvin, Johnson stated, "I knew a couple Calvins." Johnson replied in the negative when asked, "Did he say which Calvin?" Under a theory of aiding and abetting there is no requirement that the identity of the principal be established. *State v. Kern*, 307 N.W.2d 22, 28 (Iowa 1981) (*Kern I*).

While there was evidence linking Marshall to the murder based on Marshall's own statements to officers, the testimony of Martin and Freeman, gunshot residue on his jacket, and evidence Marshall put some clothing in a garbage bag and took it out to a dumpster, Johnson's testimony provides important evidence on the issue of whether Marshall was guilty under a theory of aiding and abetting due to Johnson's statement Marshall told him Calvin was with him when he was going to commit the robbery. The case was submitted to the jurors on theories of aiding and abetting, participation in a forcible felony, and joint criminal conduct. The jurors could vote for more than one theory. Eleven jurors voted for aiding and abetting, seven for a forcible felony, and two for joint criminal conduct. If Johnson's testimony is eliminated, then the evidence that Marshall and Calvin committed the offense together is also eliminated. We conclude the extent of the harmlessness of the error in admitting Johnson's testimony is debatable or open to question.

Third, while a reversal will result in protracted and costly proceedings, we are unable to conclude those proceedings would be ultimately futile. Although without Johnson's testimony there is not as much evidence to support a conviction based on aiding and abetting, we cannot conclude there is insufficient evidence from which a jury could find Marshall aided and abetted someone else in the murder.

Based on the three-factor test found in *Blaise*, 830 N.W.2d at 319, we conclude it would be inappropriate for us to engage in a sua sponte harmless-error review. Because the issue of harmless error was not raised by the parties,

we will not consider it. *See State v. Dudley*, 856 N.W.2d 668, 678 (Iowa 2014) ("The State does not argue the admissibility of the objectionable statements constitute harmless error. Therefore, we will not make the arguments for the State or reach the issue of harmless error.").

## IV. Jury Instructions

Marshall claims the district court erred by instructing the jury on the theories of aiding and abetting and joint criminal conduct because there was insufficient evidence in the record to support submitting these theories to the jury.[7] He claims there is not substantial evidence in the record to show more than one person participated in the offense. "We review jury instructions to decide if they are correct statements of the law and are supported by substantial evidence." *State v. Schuler*, 774 N.W.2d 294, 297 (Iowa 2009). Our standard of review is for the correction of errors at law. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001).

A. "To sustain a conviction under a theory of aiding and abetting, 'the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission.'" *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011) (citation omitted). "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *Id*. "A defendant's participation may however be

---

[7] On appeal, Marshall claims this error violated his constitutional right to a fair jury trial. He recognizes, however, defense counsel did not frame his objections to these instructions in constitutional terms. We conclude Marshall failed to preserve error on his constitutional arguments about the jury instructions. *See Paulsen*, 293 N.W.2d at 247.

proven by circumstantial evidence." *Id.* Factors such as presence, companionship, and conduct before and after the offense may be considered in determining whether a defendant participated in a crime. *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994).

The State points out that from the evidence presented at the trial, the jury could have determined Marshall aided and abetted Thompson or White, or both, in committing the offense. Marshall told officers the robbery had been planned by Thompson and White. He told officers and Johnson that Thompson had shot Versypt. There was evidence of Thompson's involvement—the murder weapon belonged to Thompson; when officers arrived he was outside the apartment building;[8] and he and Marshall took some trash bags to a dumpster on the night after the murder. There was also evidence Marshall had been talking to White outside the back door of the apartment building, near where the shooting took place.

The jury could have believed Marshall's statements that Thompson and White were involved in the robbery and shooting, but concluded Marshall was also involved. As the district court stated in its ruling on post-trial motions, "In short, in part from Defendant's own statements, there was evidence from which the jury could reasonably have found that one or more persons other than Defendant were involved in the crime." The State is not required to establish the identity of the principal. *Kern I*, 307 N.W.2d at 28. We conclude the district court

---

[8] This is consistent with Brown's testimony that immediately after the shooting he heard the downstairs back door "bust open real quick."

did not err in determining there was substantial evidence in the record to support the submission of the instructions on aiding and abetting to the jury.

**B.** In order to show a defendant engaged in joint criminal conduct, the State must prove: (1) the defendant was acting in concert with another; (2) the defendant must knowingly be participating in a public offense; (3) a "different crime" must be committed by another participant in furtherance of the defendant's offense; and (4) the commission of the different crime must be reasonably foreseen. *State v. Smith*, 739 N.W.2d 289, 294 (Iowa 2007). "'In furtherance of' is not limited to acts done to promote or advance the underlying crime, but includes acts done while furthering that offense." *Id.* As with aiding and abetting, there is no requirement under a theory of joint criminal conduct that the State must prove the identity of the principal actor. *State v. Kern*, 307 N.W.2d 29, 30 (Iowa 1981) (*Kern II*).

From Marshall's own statements there is substantial evidence in the record to show he was acting in concert with Thompson or White, or both. Marshall knew he was participating in the public offense of robbery; he planned the robbery of Versypt based on his belief the landlord would be carrying cash. A different crime, shooting Versypt, was committed by another participant in furtherance of the robbery. Killing Versypt allowed the participants to avoid being identified, allowed them to take his wallet without resistance, and assisted in their escape. Furthermore, the shooting was a reasonably foreseeable outcome of the robbery. *See State v. Speaks*, 576 N.W.2d 629, 633 (Iowa Ct. App. 1998)

("A murder is a reasonably foreseeable crime when using a gun to threaten robbery victims.").

In the post-trial ruling, the district court found "there was substantial evidence on which the jury could have made findings that Mr. Versypt was killed in the course of an intended robbery." We determine the court did not err in concluding, "there was also sufficient evidence from which the jury could have concluded that Defendant participated in joint criminal conduct which resulted in the forcible felony of robbery, during which Mr. Versypt was killed." We conclude the court properly submitted instructions on joint criminal conduct to the jury.

## V.     Ineffective Assistance

Marshall contends he received ineffective assistance from his defense counsel. We review claims of ineffective assistance of counsel de novo. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). To establish a claim of ineffective assistance of counsel, a defendant must show (1) the attorney failed to perform an essential duty, and (2) prejudice resulted to the extent it denied the defendant a fair trial. *State v. Carroll*, 767 N.W.2d 638, 641 (Iowa 2009). A defendant has the burden to show by a preponderance of the evidence counsel was ineffective. *See State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992).

**A.**     Marshall claims he received ineffective assistance because defense counsel did not raise a claim based on the Iowa Constitution in his motion to suppress. He states, "counsel should have argued an interpretation of

the Iowa Constitution to provide protection of the rights to counsel that is broader than protection provided under the federal Constitution."[9]

The Iowa Constitution states, "In all criminal prosecutions . . . the accused shall have a right to . . . have the assistance of counsel." Iowa Const. art. I, § 10. This provision is broadly construed "to effectuate its purpose, which was to correct the imbalance between the position of the accused and the powerful forces of the State in a criminal prosecution." *State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987). In a case where a defendant claimed he made statements to officers based on promises of leniency, the Iowa Supreme Court stated, "We hold that our constitution prohibits agents of the State from initiating any conversations or dealings with an accused concerning the criminal charge on which representation of counsel has been sought." *Id.*

Similar to the Sixth Amendment, the rule under the Iowa Constitution applies to State agents. *See id.*; *Nelson*, 325 N.W.2d at 120 (considering the Sixth Amendment and noting the informant did not qualify as a state agent). We note that "when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose." *State v. Davis*, 304 N.W.2d 432, 434 (Iowa 1981). "Special respect and deference is accorded United States Supreme Court interpretations of similar language in the federal constitution." *Id.*; *see also State v. Findling*, 456 N.W.2d 3, 6 (Iowa Ct.

---

[9] This issue is moot as to the testimony of Johnson because we have concluded Johnson's testimony of information he obtained from Marshall after July 12, 2011, should be suppressed based on the federal constitution. We consider this issue as to Martin and Freeman only.

App. 1990) (interpreting Article I, section 10 of the Iowa Constitution in accord with the Sixth Amendment).

We have already determined Freeman and Martin were not acting as agents of the State when Marshall talked to them about this case. Because the Iowa Constitution, like the federal constitution, prohibits state agents from questioning a defendant after the defendant has invoked his right to counsel, we conclude Marshall has not shown that if defense counsel had raised an argument based on the Iowa Constitution that it would have been successful. "We will not find counsel incompetent for failing to pursue a meritless issue." *State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013). We determine Marshall has not shown he received ineffective assistance of counsel on this ground.

**B.** Marshall also claims he received ineffective assistance because defense counsel did not object to the jury instructions on aiding and abetting and joint criminal conduct on constitutional due process grounds. He states, "The due process violation is not a categorical challenge to the statutory validity of liability by the rule of joint criminal conduct. The due process violation was in the trial court's application of the rule to the instant case." He asserts the instructions were confusing and this led the jury to find Marshall guilty based on something other than the evidence presented in the case. Marshall asserts an objection on due process grounds would have been successful and would have changed the outcome of the case.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged." *State v. Frei*, 831 N.W.2d 70, 76 (Iowa 2013). "[T]aken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Id.*

In reviewing Marshall's objections to the instructions on aiding and abetting and joint criminal conduct, we determined there was substantial evidence in the record to support the submission of these instructions to the jury. Because the instructions were supported by substantial evidence, we do not believe the instructions were confusing, or that Marshall has shown the jury determined his guilt based on something other than proof beyond a reasonable doubt. We conclude he has not shown he was denied due process based on the court's decision to give these instructions. Marshall has not met his burden to show by a preponderance of the evidence counsel was ineffective. *See McKettrick*, 480 N.W.2d at 55.

We have determined that all statements made by Marshall to Johnson after July 12, 2011, should have been suppressed as having been made in violation of Marshall's Sixth Amendment right to counsel. Because the issue was not raised by the parties, we have not engaged in a harmless-error analysis. We determine Marshall's conviction for first-degree murder must be reversed and the case remanded to the district court. Because issues relating to the jury instructions may arise on remand, we have considered the jury instructions and find no error.

**REVERSED AND REMANDED.**

Bower, J., concurs specially; McDonald, J., dissents.

**BOWER, J.** (concurring specially)

I concur in the result but choose to write separately. My fellow panel members have appropriately set out the case law in this area, and therefore I see no reason to repeat it. However, I believe there are additional facts showing Marshall's conviction should be reversed. The State asks us to believe the events that occurred from the time the arrest warrant was issued for Marshall on July 12, 2011, until the interviews of the jailed informants were completed in October 2011, are merely a coincidence. The American Heritage dictionary defines a coincidence as: "A sequence of events that although accidental seems to have been planned or arranged." American Heritage Dictionary 173 (4th ed. 2004).

After a review of the record, I am convinced the actions of law enforcement, and the subsequent information provided by Johnson, was not coincidental. The murder of Versypt occurred on or about October 8, 2009. Marshall's whereabouts after the murder were known to Johnson and law enforcement as Marshall was questioned while living in Burlington, Iowa, before he fled to Texas. Marshall was apprehended in July 2011 and had an initial appearance in Iowa on July 26, 2011. Marshall, who knew Johnson, Martin, and Freeman prior to his arrest in Texas, was placed in the Muscatine County Jail on his state charge for murder while the others were held in the same jail on federal drug charges. Johnson (as previously noted) knew Marshall and had talked to him concerning the murder. Law enforcement interviewed Johnson prior to Marshall's arrest and prior to Marshall being placed in the Muscatine County Jail

as an "overflow" inmate from another county. Johnson had pleaded guilty to drug charges in February 2011 (prior to Marshall's return), and expected to be sentenced in July 2011, but was not sentenced until March of 2012—seven months after the original sentencing date.

Before Marshall returned to Iowa, Detective Smithey met with Johnson at the jail on July 12, 2011, and asked Johnson more questions about the Versypt murder. Smithey advised Johnson if he was to learn anything about the Versypt murder from Marshall (who had not been placed in the Muscatine County Jail as of the time of the interview) to let Smithey know as he was interested in any information about the murder—specifically information about Thompson, Marshall, and White. From the initial meeting between Smithey and Johnson on July 12, 2011, (the same day the arrest warrant was issued for Marshall) Smithey met with Johnson approximately one to three additional times. Johnson provided Smithey and Clarahan with incriminating information derived from Marshall that helped seal his conviction.

During the several months while Johnson and Marshall were held in the Muscatine County Jail, they were both placed in administrative segregation, which limited their interactions but did allow for one hour of time outside their individual jail cell. Their time in segregation overlapped in excess of seven days. In addition to advising Johnson about gathering information on Marshall, Smithey told Johnson to spread the word within the jail that Smithey wanted to know about the crime.

These additional factors convince me a combination of circumstances, not luck or happenstance, resulted in an implied, if not express, agreement for Johnson to deliberately elicit statements from Marshall. These circumstances resulted in the functional equivalent of an interrogation by law enforcement. For those reasons, I concur in the reversal of this matter due to my lack of confidence Marshall received a fair trial.

**MCDONALD, J.** (dissenting)

What we have here is a failure of proof. To establish a violation of his Sixth Amendment right to counsel, as relevant here, Marshall was required to establish both that Carl Johnson was acting as an agent of the State and that Johnson deliberately elicited the statements at issue from Marshall. The majority opinion and special concurrence discuss in great detail the evidence establishing agency but wholly ignore the lack of evidence establishing deliberate elicitation. I conclude Marshall failed to establish Johnson deliberately elicited from him the statements at issue. I would hold the district court did not err in denying Marshall's motion to suppress the statements Marshall made to informant Johnson.[10]

*Massiah* was the first of four newly-created Warren Court constitutional exclusion doctrines relating to incriminating statements issued during a four-year period in the 1960s. *See* James J. Tomkovicz, *Sacrificing Massiah: Confusion Over Exclusion and Erosion of the Right to Counsel*, 16 Lewis & Clark L. Rev. 1, 4-5 (2012). In *Massiah*, the Could held the defendant "was denied the basic protections of [the Sixth Amendment right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206.

---

[10] I agree with the majority that the State failed to establish agency with respect to informants Martin and Freeman and that the district court did not err in denying Marshall's motion to suppress with respect to the statements Marshall made to informants Martin and Freeman.

The Court revisited *Massiah* in *Henry*. In that case, the Court held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Henry*, 447 U.S. at 274. Mr. Justice Powell concurred in the Court's judgment but expressed a narrow interpretation of *Massiah*:

> The rule of *Massiah* serves the salutary purpose of preventing police interference with the relationship between a suspect and his counsel once formal proceedings have been initiated. But *Massiah* does not prohibit the introduction of spontaneous statements that are not elicited by governmental action. Thus, the Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments. Similarly, the mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional. In such a case, the question would be whether the informant's actions constituted deliberate and "surreptitious interrogatio[n]" of the defendant. If they did not, then there would be no interference with the relationship between client and counsel.
> . . . . I could not join the Court's opinion if it held that the mere presence or incidental conversation of an informant in a jail cell would violate *Massiah*. To demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that, considering all of the circumstances, is the functional equivalent of interrogation.

*Henry*, 447 U.S. at 276-77 (Powell, J., concurring) (citation omitted).

In *Kuhlmann*, the Court adopted Mr. Justice Powell's more limited reading of *Massiah*. Writing for the *Kuhlmann* Court, Mr. Justice Powell explained the doctrine as follows:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," [*Moulton*,] 474 U.S., at 176 at 487, citing *United*

> *States v. Henry*, [477 U.S.] at 276 (Powell, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Kuhlmannn*, 477 U.S. at 459. Applying this more limited interpretation of *Massiah*, the Court held the defendant failed to establish a *Massiah* violation. Although the *Kuhlmann* court attempted to distinguish rather than overrule *Henry*, the cases appear materially indistinguishable. *See id.* at 473-75 (Brennan, J., dissenting) (explaining the case was "virtually indistinguishable from *Henry*" and discussing same).

Under *Kuhlmann*, the defendant bears the burden of establishing both that the informant was acting as an agent of the State and that the "informant took some action . . . that was designed deliberately to elicit incriminating remarks." *Id.* at 459. These are separate and distinct elements. *See Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991) ("To establish his claim, [the defendant] 'must show (1) that a fellow inmate was a government agent, and (2) that the inmate deliberately elicited incriminating statements from' him."); *Wallace v. Price*, 265 F. Supp. 2d 545, 569 (W.D. Pa. 2003) (explaining that agency element is distinct from the deliberate elicitation element); *People v. Williams*, 940 P.2d 710, 744 (Cal. 1997) ("As we have recognized, in order to prevail on a *Massiah* claim involving use of a government informant, the defendant must demonstrate that . . . the informant (1) was acting as a government agent, *i.e.*, under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage; and (2) deliberately elicited incriminating

statements."); *State v. Fields*, 908 P.2d 1211, 1217 (Idaho 1995) ("The inquiry into such possible Sixth Amendment violations requires that this Court determine whether (1) the inmates were acting as agents of the police, and (2) the informants affirmatively and deliberately elicited the incriminating statements.").

The first element requires proof of agency. The inquiry is more akin to the state action doctrine rather than commercial agency. *See* James J. Tomkovicz, *An Adversary System Defense of the Right to Counsel Against Informants: Truth, Fair Play, and the Massiah Doctrine*, 22 U. C. Davis L. Rev. 1 (1988) (explaining the first element requires proof the government created or exploited a situation in which the informant is likely to elicit inculpatory statements). The majority and special concurrence conclude Johnson was working as an agent of the State. I have no quibble with that conclusion.

The second element requires proof of deliberate elicitation. This requires the defendant to establish the informant engaged in "the functional equivalent of interrogation." *Henry*, 447 U.S. at 276-77 (Powell, J., concurring). The informant being placed in close proximity to the defendant is not enough to satisfy the standard. *See United States v. Jacques*, 684 F.3d 324, 331-32 (2d Cir. 2012) ("[T]he Sixth Amendment does not forbid admission in evidence of an accused's statements to a jailhouse informant who was placed in close proximity but made no effort to stimulate conversations about the crime charged."). Moreover, the Sixth Amendment does not forbid admission in evidence of an accused's statements to an informant made during conversations not rising to the level of surreptitious interrogation. *See id.* Instead, to prove a violation of the right to

counsel, the defendant must establish the informant's conduct was the functional equivalent of an uncounseled interrogation. *See Kansas v. Ventris*, 556 U.S. 586, 592 (2009) (stating "the *Massiah* right is a right to be free of uncounseled interrogation, and is infringed at the time of the interrogation"); *id.* ("The constitutional violation occurs when the uncounseled interrogation is conducted.").

I conclude there is a wholesale failure of proof that Johnson engaged in conduct arising to the functional equivalent of an uncounseled interrogation and that this failure of proof is fatal to Marshall's claim. *See Pursell v. Horn*, 187 F. Supp. 2d 260, 338 (W.D. Pa. 2002) (stating defendant must "prove the informant affirmatively [sought] to induce [incriminating statements]") (alterations in original). What evidence did Marshall offer in support of his claim during the suppression hearing? Only two witnesses were called during the suppression hearing, Officers Smithey and Clarahan. As pertinent here, Smithey testified as follows:

> Q. Did you make any request from Carl Johnson at that time to gather more information or to try to contact Justin Marshall for further information? A. I did not. I only requested that he contact me if he learned anything further.
> . . . .
> Q. Did you ever make any effort, once Justin Marshall was arrested, to have him placed in the cell with anybody in particular? A. No.
> Q. Including Carl Johnson? A. I did not.
> . . . .
> Q. Did you subsequently meet with Carl Johnson then on September 5, 2011? A. I did.
> Q. And did he relay to you information that he had obtained from Justin Marshall in the Muscatine County Jail? A. Yes, he did.
> Q. And what time frame did he say that he obtained that information? A. He indicated that he had obtained some

information while they were each in a segregated area of the Muscatine County Jail in August of 2011.

Q. Had you made any effort to get them into segregation? A. No.

Q. Was it your understanding that they were in segregation for different purposes, for different violations? A. Yes.

Q. The information he provided you then, was it all information he had obtained prior to your meeting with him on September 13 of 2011? A. Yes.

Q. At any time when you met with Mr. Johnson, either in July or in September, did you ever ask him to do anything to try to obtain more information or any information from Justin Marshall regarding John Versypt's death? A. No. Only to contact me if he learned anything.

Q. Did any of the other investigators present when you interviewed Mr. Johnson on July 12 ever say anything to the effect of you should get more information or tell him to do anything further for the investigation of John Versypt's death? A. No.

Officer Clarahan testified similarly to Smithey:

Q. At that meeting, did you ever request Carl Johnson to obtain other information for you or to do anything further on behalf of the State in the investigation of John Versypt's murder? A. No.

Q. Did you hear anybody else from the government making that request of him? A. No, I did not.

Q. Did you make any arrangements for Carl Johnson to ever be placed in the same cell, cell block, pod, anything at the Muscatine County Jail with Justin Marshall? A. No.

. . . .

Q. Did you ever ask . . . Carl Johnson . . . to do anything on behalf of the State to gather information from Justin Marshall regarding the John Versypt murder? A. No.

This is the totality of the relevant evidence presented to the district court during the suppression hearing. There was no evidence received during the suppression hearing establishing Johnson conducted the functional equivalent of an uncounseled interrogation. Indeed, there was no evidence received during the suppression hearing illuminating any of the details regarding Johnson's contact with Marshall. We should not fault the district court for denying the

motion to suppress when the defendant failed to adduce evidence in support of the motion.

Looking beyond the suppression record, there is also nothing in the trial record evidencing "deliberate elicitation." *See State v. Brooks*, 760 N.W.2d 197, 203-04 (Iowa 2009) (explaining an appellate court may consider the evidence during a suppression hearing as well as the evidence admitted at trial). Johnson testified he was placed in the segregation unit, or special housing unit, at the Muscatine County Jail in August 2011 for violating facility rules. Inmates in the segregation unit are housed in single cells, and they get one hour out of their cells per day. Johnson estimated he was in the segregation unit for approximately seventeen days. Marshall was in the segregation unit for approximately nine to ten of these days, also for violating facility rules. Johnson did not request to be in the segregation unit. Johnson did not know Marshall was in the segregation unit at the time he was moved to the unit:

> Q. And you knew that Justin was also in segregation didn't you? A. No.
> Q. You sure about that? A. Positive.
> Q. Okay. But he just happened to be in segregation? A. Yes.

While in the segregation unit, Johnson and Marshall spoke with each other. Johnson testified that *Marshall initiated* the discussions regarding Marshall's case:

> Q. All right. And he just happened to start suddenly talking to you about his case? A. He didn't just start talking to me over just a couple days. He started talking to me, yes.
> . . . .

Q. And only when you're alone in segregation does he suddenly open up to you, correct? A. Yeah. He told me about it a little bit, yeah.

There is no evidence contrary to Johnson's testimony regarding the nature of his interactions with Marshall.

The defendant bears the burden of coming forward with evidence establishing the State violated his right to counsel. He failed to meet his burden. Marshall's *Massiah* claim is speculation, conjecture, and belief unsupported by evidence. The evidence established several facts dispositive of Marshall's claim with respect to Johnson's testimony. No state actor instructed Johnson to obtain information from Marshall. No state actor requested Johnson to obtain information from Marshall. Smithey merely identified Marshall and two others as persons of interest and told Johnson to contact him if he heard anything. The prosecution did not make arrangements to place Johnson in proximity to Marshall. Johnson made no efforts to be placed in proximity to Marshall. Johnson and Marshall were in the segregation unit together for only nine to ten days and had limited time to hold any conversations. It was Marshall, not Johnson, who initiated conversations regarding the murder. There is no evidence that Johnson asked questions during those conversations designed to elicit additional information regarding the murder. There is no evidence regarding the nature of Marshall and Johnson's conversations showing that Johnson conducted the functional equivalent of an uncounseled interrogation of Marshall.

Under similar facts, the Iowa Supreme Court and numerous other courts have concluded the defendant failed to prove a violation of his right to counsel.

*See State v. Liggins*, 524 N.W.2d 181, 186-87 (Iowa 1994) (denying *Massiah* claim where there was a lack of evidence establishing deliberate elicitation); *see also United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010) (holding inmate did not deliberately elicit statements from defendant where the statements were made during conversation regarding many other things); *United States v. Lentz*, 524 F.3d 501, 521-22 (4th Cir. 2008) (holding no deliberate elicitation where jailhouse informant was told to personalize conversations to bring up matters of common interest rather than elicit information about the case); *Moore v. United State*, 178 F.3d 994, 1000 (8th Cir. 1999) (denying relief where there was no proof of "any improper or surreptitious interrogation"); *Lightbourne v. Dugger*, 829 F.2d 1012, 1021 (11th Cir. 1987) (holding there was no deliberate elicitation where informants "took no actions to stimulate the incriminating remarks"); *Wallace v. Price*, 265 F. Supp. 2d 545, 569 (W.D. Pa. 2003) (holding no deliberate elicitation where "[t]here [was] no evidence of instruction to obtain information and no evidence that informant initiated the conversation" even where the informant was placed in a cell near defendant and they had a prior personal relationship); *Pursell*, 187 F. Supp. 2d at 338 (stating there was "nothing in the record to establish deliberate elicitation"); *People v. Williams*, 940 P.2d 710, 744 (Cal. 1997) (concluding defendant was a mere "listening post" and that while the defendant and the informant talked about their cases together "nothing in the record suggests that [the informant] actively questioned defendant about defendant's case"); *State v. Swinton*, 847 A.2d 921, 966 (Conn. 2004) (stating there is no "bright line test" to determine whether statements were deliberately

elicited and the court must "scrutinize the record to determine whether the exchanges . . . look like government interrogations"); *State v. Fields*, 908 P.2d 1211, 1217 (Idaho 1995) (affirming denial of motion to suppress where the defendant "presented no evidence to establish that the informants asked any questions or initiated any conversations about the murder"); *State v. Johnson*, 858 N.E.2d 1144, 1178 (Ohio 2006) (finding no deliberate elicitation where informant and defendant were placed in same cell without government involvement and defendant "volunteered" information); *Sincock v. State*, 76 P.3d 323, 333 (Wyo. 2003) (holding informant's receipt of information was passive and not deliberate elicitation).

On de novo review, finding no proof that informant Carl Johnson deliberately elicited statements from Marshall regarding Marshall's murder of Versypt, and finding overwhelming authority supporting the proposition that the defendant's *Massiah* claim fails in the absence of such proof, I conclude the district court did not err in denying Marshall's motion to suppress. Accordingly, I respectfully dissent.